589 P.2d 896

Bobby Joe BRADY, Individually, and as Conservator of the Estate of Tara Wynn Brady, a minor, Appellant,

v.

MELODY HOMES MANUFACTURER, a corporation, Appellee.

No. 1 CA–CIV 3833.

Court of Appeals of Arizona, Division 1, Department B.

Oct. 5, 1978.

Review Denied Jan. 23, 1979.

Stanfield, McCarville, Coxon, Cole & Fitz-gibbons by A. Thomas Cole, Casa Grande, for appellant.

O'Connor, Cavanagh, Anderson, West-over, Killingsworth & Beshears by Richard J. Woods, Phoenix, for appellee.

## OPINION

JACOBSON, Presiding Judge.

This case involves a product which is allegedly defective because of its design. The basic question on appeal is what is a "defect" for strict liability purposes in such a design case.

Appellant, Bobby Joe Brady, individually and as conservator of the estate of Tara Wynn Brady, brought an action against appellee Melody Homes Manufacturer (Melody Homes) for the death of Bobby Brian Brady and for injuries sustained by Tara Wynn Brady as the result of a fire which destroyed a mobile home manufactured by Melody Homes. The liability of Melody Homes was premised upon alleged design defects in the mobile home, consisting of a design which only provided one egress and the failure of the manufacturer to install smoke detector alarms, escape hatches and pop-out windows. The trial court granted Melody Homes' motion for summary judgment and Mr. Brady has appealed.

The evidence, at least as produced before the trial court, is not in material dispute. Melody Homes manufactured the mobile home in question immediately prior to February, 1964. In February, 1964, the mobile home was sold and delivered to Pinal Trailer Sales, Inc. in Casa Grande, Arizona. The mobile home was subsequently sold, apparently several times, until it was acquired by a Henry Freeman who in turn rented it to Patricia Ann Balcolm and her two children, Bobby Brian Brady and Tara Wynn Brady. Mrs. Balcolm was the former wife of the appellant, and he is the father of the minor children involved.

The mobile home in question was rectangular in shape with sleeping areas in both ends and dining/kitchen/living room areas in the middle. It is undisputed that the only ingress and egress of the mobile home was in the dining/kitchen/living room area. It is also undisputed that at the time of manufacture and delivery in 1964, it was not equipped with smoke detector equipment, escape hatches and pop out windows. The record does not disclose the dimensions of the mobile home, its price, or its rental income.

During the night of December 3, 1974, a fire of unknown origin (appellant does not contend the cause of the fire can be laid at the manufacturer's doorstep) destroyed the mobile home. In the conflagration, Patricia Balcolm and Bobby Brian Brady perished and Tara Wynn Brady was severely burned.

Melody Homes' motion for summary judgment was supported by an affidavit containing admissible testimony "that smoke detector devices and egress windows were not known to, or available for, the use of the mobile home construction industry in the United States in 1964." This affidavit went on to say that these devices became available in the early 1970's and were adopted in May, 1973 by the American National Standards Institute as standards for mobile homes.

The only affidavit in opposition to the motion for summary judgment, prepared by a safety engineer, stated that photoelectric smoke detectors were the subject of standards adopted by the American National Standards Institute in July, 1962, and that "push out" or egress windows were required for certain Interstate Commerce Commission motor carriers as early as 1952.

No other evidence was offered or even suggested by the appellant.

Appellant's main argument on appeal is that the present state of Arizona law in the field of strict tort liability is wrong and that we should adopt what is, in his opinion, the enlightened view of California as expressed in *Cronin v. J.B.E. Olson Corp.*, 8 Cal.3d 121, 104 Cal.Rptr. 433, 501 P.2d 1153 (1972), which rejected the concept that a defective condition to be actionable must be unreasonably dangerous to the user or consumer.

The Arizona Supreme Court has specifically rejected this reasoning and has laid to rest the *Cronin* rationale in Arizona. *Byrns v. Riddell, Inc.*, 113 Ariz. 264, 550 P.2d 1065 (1976). While valid reasons exist for this rejection, we need not reiterate them here. We merely point out that the deletion of

the unreasonably dangerous requirement leaves the term "defect" without a definitive standard by which a defect may be judged. *See* Keeton, *Product Liability and the Meaning of Defect,* 5 St. Mary's L.J. 30 (1973); Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss.L.J. 825 (1973); Weinstein, Twerski, Piehler and Donaher, *Product Liability: An Interaction of Law and Technology,* 12 Duq.L.Rev. 425 (1974) (the authors characterizing *Cronin* as "seriously off the mark." *Id.* at 433 n. 12.)

While the Restatement definition of "defective condition" as being, "a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him," Comment g, Restatement (Second) of Torts, § 402 A, has been subject to criticism,[1] it does have the virtue of providing a legal standard by which judges and juries can measure the concept of "defects." Moreover, the definition seems to work reasonably well in the manufacturing defect case, that is, "if something goes wrong" in the manufacturing or assembling process and the result is a product which the manufacturer did not intend, nor the consumer contemplate—for example, the safety hasp in *Cronin.*

In any event, appellant contends that the design of Melody Homes' mobile home contained defects unreasonably dangerous—one specific defect (the failure to provide smoke detectors) and one general defect (the overall design providing only one egress; we include lack of window egress in this category) are alleged.

We deem it advisable before specifically discussing these alleged defects, to review, insofar as review is possible, the various approaches taken by courts and commentators in the troublesome area of design in the field of strict liability in tort.

Generally, products liability has arisen in three areas: (1) manufacturing defects, (2) design defects and (3) warning or instruction defects, that is, failure to warn or instruct in the use of the product. Since warning defects are not involved in this litigation and a discussion of the law in this area is not necessary for the background analysis we undertake in this case, we say no more on this subject.

We have previously indicated that the Restatement definition of "defect" works reasonably well in the manufacturing defect case. In the manufacturing defect case, this is also true of the Restatement concept of strict liability itself—proof of a "defect", plus injury, plus proximate cause equals liability. Moreover, the proof as to the existence of the defect in manufacturing defect cases is relatively straightforward, usually by comparison of the injury-producing product with other non-defective products in the same line.

However, the same is not true in design defect cases. There, the manufacturer produces a product exactly as intended. Thus, generally the design defect case affects an entire line of products, while the manufacturing defect case is involved with only a limited number of that line.

■ As has been pointed out, these distinctions may become blurred or meaningless in particular cases. *See* Phillips, *The Standard for Determining Defectiveness in Products Liability,* 46 Cinn.L.Rev. 101, 103–104 (1977). However, in our opinion, a distinction between the proof of a defect in design cases and manufacturing cases does exist, for in some design defect cases the issue of *feasibility* of a safer product is present, whereas that issue is generally absent from the manufacturing case. *See Sutkowski v. Universal Marion Corp.,* 5 Ill. App.3d 313, 281 N.E.2d 749 (1972). It is this element of "feasibility" that has created the controversy as to the application of principles of strict liability to the design defect in products liability cases. *See generally* Twerski, *From Defect to Cause to Comparative Fault—Rethinking Some Product Liability Concepts,* 60 Marq.L.Rev. 297 (1977).

---

1. Dean Wade would use the term "not duly safe" in place of a "defect unreasonably dangerous," as "unreasonably dangerous" has connotations of ultrahazardous. Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss.L.J. at 832, 833 (1973), *supra.*

We believe the California case of *Barker v. Lull Engineering Co., Inc.*, 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443 (1978), provides a springboard for the discussion of the products liability case based on design. In *Barker*, the court approached this problem of proof in design defects cases by retaining concepts of strict liability but propounding a two-prong definition of "defect:"

"[A] product is defective in design (1) if the plaintiff demonstrates that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or (2) if the plaintiff proves that the product's design proximately caused his injury and the *defendant fails* to prove, in light of the relevant factors . . ., that on balance the benefits of the challenged design outweigh the risk of danger inherent in such design." 20 Cal.3d at 435, 143 Cal.Rptr. at 239–240, 573 P.2d at 457–458 (1978) (emphasis added).

The "relevant factors" listed by *Barker* are: [2]

"[T]he gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design." 20 Cal.3d at 431, 143 Cal.Rptr. at 237, 573 P.2d at 455 (1978).

We note that the first definition of "defect" utilized by the *Barker* court is similar to the Restatement § 402 A definition of both "defective condition" and "unreasonably dangerous." "Defective condition" is defined by the Restatement as, "a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to

him." Restatement (Second) of Torts § 402 A, Comment g. The Restatement goes on to define "unreasonably dangerous" as, "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." Restatement (Second) of Torts, § 402 A, Comment i.

Although California has purportedly abolished the requirement that the plaintiff prove the product to be "unreasonably dangerous," *Cronin, supra*, when the definition of defect, be it one of design or manufacture, embraces the concept of consumer contemplation, we see little difference, if any, between the Restatement and the California approach to strict liability.

In this regard, we think California is on the right track when the proof of a design defect is that it falls below the reasonable expectation of the ordinary consumer.

We feel relatively comfortable applying strict liability principles to those cases in which the product falls below the reasonable expectations of the ordinary consumer. The "defect" is ascertainable by an objective standard, i. e., not within reasonable consumer expectation which is unreasonably dangerous.

As *Barker* points out, however, the reasonable expectation test may not be applicable in a large number of design cases, for "in many situations . . . the consumer would not know what to expect, because he would have no idea how safe the product could be made." 20 Cal.3d at 430, 143 Cal. Rptr. at 237, 573 P.2d at 454, (quoting Wade, *On the Nature of Strict Tort Liability for Products*, 44 Miss.L.J. 825, 829). These are the cases around which controversy centers, the design cases in which the accepted Restatement definition of "defect" is not applicable.

---

2. *Byrns v. Riddell, Inc.* has propounded a similar "check list":

"(1) The usefulness and desirability of the product, (2) the availability of other and safer products to meet the same need, (3) the likelihood of injury and its probable seriousness, (4) the obviousness of the danger, (5) common knowledge and normal public expectation of

the danger (particularly for established products), (6) the avoidability of injury by care in use of the product . . ., and (7) the ability to eliminate the danger without seriously impairing the usefulness of the product or making it unduly expensive." 113 Ariz. 264, 267, 550 P.2d 1065, 1068 (1976).

In this context, courts and commentators have attempted to define "defect" and "unreasonably dangerous" by reference to the feasibility of a safer design. "Feasibility," in turn, is based upon a risk/benefit analysis which utilizes several factors. *Byrns v. Riddell, Inc., supra; Barker v. Lull Engineering Co., Inc., supra; Dorsey v. Yoder Co.*, 331 F.Supp. 753 (E.D.Pa.1971), aff'd, 474 F.2d 1339 (3d Cir. 1973); Wade, *On the Nature of Strict Tort Liability for Products, supra*; for a position *contra, see* Epstein, *Products Liability: The Search for the Middle Ground*, 50 N.C.L.Rev. 643 (1978).

The critical question in determining the feasibility of a safer design (and thus a "defect" in strict liability parlance) is whether the trier of fact should look to the product alone, or should consider the conduct of the manufacturer in producing that product. In our opinion, where attention is focused determines the nature of the liability. On the one hand is strict liability, and on the other is negligence.

California has, it appears in *Barker*, come down on the side of strict liability. As *Barker* states:

> "It is true, of course, that in many cases proof that a product is defective in design may also demonstrate that the manufacturer was negligent in choosing such a design. As we have indicated, however, in a strict liability case, as contrasted with a negligent design action, the jury's focus is properly directed to the condition of the product itself, and not to the reasonableness of the manufacturer's conduct." 20 Cal.3d at 434, 143 Cal.Rptr. at 239, 573 P.2d at 457 (1978).

Dean Wade, in his well-known article, *On the Nature of Strict Tort Liability for Products, supra*, reaches a similar result, although linguistically dissimilar. Dean Wade would impute the scienter of negligence per se to the manufacturer and then inquire whether "a reasonably prudent manufacturer who had actual knowledge of its harmful character would place it on the market . . . ." *See also, Roach v. Kononen*, 269 Or. 457, 525 P.2d 125 (1974); *Atkins v. American Motors, Inc.*, Ala., 335 So.2d 134 (1976).

On the other hand, a pure negligence case has been advocated. As stated in Hoenig, *Products Designs and Strict Tort Liability: Is There a Better Approach?* 8 S.W.U.L. Rev. 109, 122 (1976):

> "These difficulties suggest that vague, misunderstood and misapplied tests of defective design can only add to the confusion which prevails. What is needed is a system which works well for design cases by permitting jurors to consider *all* relevant factors in ascertaining whether a particular design is one for which liability should be imposed. Such a system, which is in practice today, and which would require little adaption, is the theory of negligence." (Emphasis in original.)

Central to this dispute is what Professor Twerski characterizes as the "tough issue:"

> "What is to be done when the defendant claims and is able to establish that with the use of due care he was unable to discover the problem or, had he discovered it, would under the then available technology have been unable to solve it."

*Twerski, supra*, at 318.

California, Wade, and those cases which have completely adopted Wade's definition have in essence made the manufacturer accountable for knowledge and technology which may not have been available at the time the product was manufactured.

While *Byrns v. Riddell, Inc., supra*, has quoted a varient of the Wade definition and defined "unreasonably dangerous" by a risk/benefit analysis, we are not convinced that the Arizona Supreme Court has adopted the ramifications inherent in that definition.

Most commentators agree that strict liability in tort was adopted to correct what was seen as the two evils of warranty and ordinary negligence: (1) the requirement of privity and (2) the difficulty of proof of lack of due care.

It is important at this point to remember that the area of strict liability is in *tort*. The original meaning of the word "tort" is "wrong". In strict liability, the "wrong"

committed by the manufacturer was putting a defective product into the stream of commerce. However, if in defining the word "defect" we have eliminated any semblance of correctable wrong on the part of the defendant, we have moved out of the area of tort law and into a compensation system based on injury. This, it appears to us, is what California has moved towards by allowing a plaintiff to prove a *prima facie* case of liability by simply showing an injury proximately caused by the offending product.

Moreover, it appears to us that if the definition of "defect" embraces a risk/benefit analysis, then the court has moved out of the area of strict liability and into the area of the reasonableness of the manufacturer's conduct.

If a trier of fact or a judge must consider such factors as the "mechanical feasibility," "financial cost," and "adverse consequences to the product," as listed in *Barker*, or in the check list of *Byrns*, we do not conceive how this can be done without considering whether the manufacturer's conduct was reasonable in choosing the design utilized. For example, if a given product incorporated all of the safety factors known to technology at the time of the manufacture, and advanced technology renders that design obsolete, must not the trier of fact consider whether the manufacturer's conduct in choosing the existing "mechanical feasibility" was reasonable? Or, would not the trier of fact consider whether a manufacturer's conduct was reasonable in discarding a safety device costing $1,000 on a product made to sell for $100?

■ Based upon these considerations, it is our opinion that where the harm-producing design does not fall within the Restatement definition of "defect," strict liability does not apply. Rather, if liability is to be imposed on the grounds that the manufacturer could have feasibly made the product safer (we use the term "feasibly" here to denote a risk/benefit analysis), then the inquiry must be based upon whether the

conduct of the manufacturer was reasonable, that is, standard principles of negligence.

■ At this juncture, it is important to recognize that the standard of care of the manufacturer is that of an expert with regard to the product he sells. *Moren v. Samuel M. Langston Co.*, 96 Ill.App.2d 133, 237 N.E.2d 759 (1968); 2 Harper & James, The Law of Torts, § 28.4, at 1541 (1956). Thus, if better testing or design is available and would have eliminated the unreasonable danger, the manufacturer is expected to have known and used that method as a matter of due care.

Liability, however, does not end with a simple showing that a better mousetrap could be built. Liability only follows where a showing is made that the manufacturer was negligent in not adopting the better mousetrap design. The factors listed in *Byrns v. Riddell, Inc., supra,* are pertinent to that inquiry. With these observations in mind, we return to the design of the mobile home involved here.[3]

While the appellant has confused the issues on appeal by diverting the court's attention to specific "defects," especially the absence of smoke detectors, we believe his main contention is that Melody Homes designed a mobile home intended to be used as living quarters with only one ingress and egress and in doing so, placed that egress some distance from the sleeping quarters and opposite a likely area of point of origin of fire—the kitchen area: in essence, a death trap if fire occurs in the egress area.

This first point of inquiry is whether such a design is a defective condition for strict liability purposes, as being "a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him," or at least whether a fact issue was presented on this issue. Viewing the record as a whole, we are unable to say as a matter of law that a reasonable consumer would (1) appreciate the danger presented by one door, or (2) if appreciated, would

---

3. We do not reach, as the trial court did not reach, the issue of proximate cause of the death and injuries suffered by the minor children.

realize that other egress was unavailable through the windows present in the mobile home. The most we can say is that a factual issue is presented precluding summary judgment on strict liability principles.

■ We make one further observation on the issue of strict liability. We recently held in *Vineyard v. Empire Machinery Co.*, 119 Ariz. 502, 581 P.2d 1152 (App.1978), a design defect case, that the absence of safety devices (roll-over bars) may be so obvious that as a matter of law, a defect "unreasonably dangerous" is not present. We did not in *Vineyard* embark upon the detailed analysis of defective design set forth here, it being tacitly conceded in that case that a defect was present and the only issue was whether that defect rendered the manufacturer liable. However, as to the obviousness factor which we found important in *Vineyard*, we do not deem that factor controlling here. There is no evidence, one way or the other, that the reasonable occupant of a mobile home would appreciate that windows in the mobile home would not provide egress. Nor, based upon the record presented, can we say as a matter of law such an appreciation should have been forthcoming.

■ We can say as a matter of law, however, that a reasonable consumer in 1964 would not have contemplated that a mobile home manufactured in 1964 would contain smoke detectors. This omission, in our opinion, does not fall within the definition of "defect" for strict liability purposes, and therefore must be judged upon negligence principles—the standard being that of a reasonably prudent manufacturer. In this context, Melody Homes' "state of the art" defense [4] is viable. *Maxted v. Pacific Car & Foundry Co.*, 527 P.2d 832 (Wyo. 1974).

■ Melody Homes contends that smoke detector technology was not available to the mobile home industry in 1964. Appellants contend that at least the presence of this technology was known in 1964. In our opinion, appellant's affidavit at least reaches the threshold contradiction of Melody Homes' affidavit of technological unavailability. However, as previously pointed out, whether Melody Homes could or should have utilized this technology must await further fact finding processes.

The judgment of the trial court is reversed and the matter remanded for further proceedings.

EUBANK, J., concurs.

SCHROEDER, J., concurs in the result.

JACOBSON, Presiding Judge.

On October 5, 1978, this court issued its opinion in this matter. In that opinion we stressed the fact, alluded to in oral argument before this court, that the design of the mobile home involved provided only one ingress and egress. Based upon that fact, we held, for purposes of imposing strict liability on the manufacturer, that:

> "Viewing the record as a whole, we are unable to say as a matter of law that a reasonable consumer would (1) appreciate the danger presented by one door, or (2) if appreciated, would realize that other egress was unavailable through the windows present in the mobile home. The most we can say is that a factual issue is presented precluding summary judgment on strict liability principles."

By a timely motion for rehearing, appellee, Melody Homes Manufacturer, points out that the court was factually mistaken as to the existence of only one door to the mobile home, and that in fact the mobile home was designed with two doors and supplied a diagram of the mobile home,

---

4. We note that the legislature has added Article 9, entitled "Product Liability" to Title 12, chapter 6 of the Arizona Revised Statutes, effective for causes of action accruing on or after September 3, 1978. Under A.R.S. § 12–683 of that new section, "state of the art" is considered a defense in all products liability cases, including those to be determined under principles of strict liability. Under our analysis, in design defect cases, "state of the art," that is, "feasibility" of design, is only pertinent in a negligence context. What effect, if any, the statute has, we do not reach.

showing the location of these doors. Apparently neither party submitted a similar diagram to the trial court.

In addition, Melody Homes contends that the issue of the overall design of the mobile home was not alleged by the appellant/plaintiff as a "defect" for strict liability purposes before the trial court and thus should not afford a basis for reversal on appeal.

In support of this contention, Melody Homes points to interrogatories propounded to the plaintiff which requested information as to "each and every defect which you claim existed in the mobile home referred to in plaintiff's complaint." To this interrogatory, the plaintiff responded: "Set out with specificity in complaint."

The applicable portion of the complaint alleged:

"That the mobile home was unsafe for its intended use by reason of various defects, including, but not limited to, the following: it did not have pop-out windows; it was designed in such a way that it did not provide for escape hatches from bedrooms; and it did not have a smoke detector device."

The appellant does not dispute the existence of the two doors, although he now disputes their location as depicted in the proffered diagram.

Moreover, appellant does contend that the issue of overall design was presented to the trial court. In view of the specific allegations of plaintiff's complaint, we disagree. Here, Melody Homes attempted to determine the specific basis of its liability to the appellant. In response to this inquiry, Melody Homes fashioned its motion for summary judgment.

■ To now allow appellant to expand the basis of the alleged liability of the manufacturer to include alleged "defects" not presented to the trial court would thwart the orderly administration of justice, the aims of discovery and the laudable purpose of summary judgment to narrow the issues to be tried. *See Crook v. Anderson,* 115 Ariz. 402, 565 P.2d 908 (1977). In short, our prior opinion was in error when we considered the overall design, including the existence of only one door (or two as the case proves to be), in determining the "reasonable contemplation" of the ordinary consumer.

■ However, the issue of lack of egress from the sleeping quarters, and whether this constituted a defect, that is, "a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him" was presented to the trial court. In this regard, we observed in our prior opinion that:

"There is no evidence, one way or the other, that the reasonable occupant of a mobile home would appreciate that windows in the mobile home would not provide egress. Nor, based upon the record presented, can we say as a matter of law such an appreciation should have been forthcoming."

This observation is still valid. While the scope of inquiry is narrowed, we are still of the opinion that a factual issue is presented on the record as to whether an ordinary consumer would contemplate the lack of egress from the sleeping quarters in the event access could not be gained to the main section of the mobile home. For this reason, our erroneous view of the facts does not change the result we reached in our prior opinion.

Finally, appellee contends our prior opinion did not dispose of a jurisdictional attack made on this appeal. This attack was the subject of a separate motion to dismiss the appeal filed by appellee which was denied by the court. For the reasons stated in our order denying the motion to dismiss, the court is still of the opinion it has jurisdiction over this appeal.

By this supplemental opinion, the appellee's motion for rehearing is denied.

SCHROEDER and EUBANK, JJ., concur.