724 P.2d 612

William **BOY**, Plaintiff-Appellant,

v.

**I.T.T. GRINNELL CORPORATION,** Defendant-Appellee.

No. 1 CA–CIV 7353.

Court of Appeals of Arizona, Division 1, Department B.

Aug. 15, 1986.

Langerman, Begam, Lewis & Marks by Samuel Langerman, Richard W. Langerman, Thomas F. Dasse, Phoenix, for plaintiff-appellant.

Snell & Wilmer by Warren E. Platt, Steven C. Barclay, Susan G. Wintermute, Phoenix, for defendant-appellee.

KLEINSCHMIDT, Judge.

On November 10, 1980, the appellant, William Boy, filed suit against the appellee, I.T.T. Grinnell Corporation, (ITT), alleging that a pipe fitting produced by the defendant was unreasonably dangerous because it was improperly designed and defectively manufactured and that the fitting broke because of these defects, resulting in injury to the plaintiff. The jury found for ITT. On appeal, Boy argues there was error in the jury instructions and in the admission and exclusion of evidence.

The product involved is a cast iron pipe fitting—a 1 × ¾ inch concentric reducer used to connect a one inch pipe to a three-quarter inch pipe. The ITT reducer consists of two threaded female ends connected by a transitional section.

The fitting introduced in evidence is what remains of a 1 × ¾ inch reducer which was purportedly installed as part of a fire protection system at the Scottsdale Shadows condominiums. The sprinkler system is made of cast iron pipe which is connected to the city water main. That pipe is then connected to smaller pipes which extend

throughout all floors of the building. Finally, "drops" are installed, vertical pipes which extend downward from the skeletal system of pipes into the rooms, hallways, and stairwells of the building. The drops consist of a piece of pipe one inch in diameter to which a reducer is attached before the sprinkler heads are installed. The fitting which is the subject of this case was the $1 \times {}^3\!/_4$ inch reducer portion of the drop that was purportedly originally installed above the stairwell door on the sixth floor landing of the building.

The sprinkler system was being installed by the Grantham Company, which had hired Boy as an apprentice pipe fitter and assigned him to help with the installation of the fire protection system. Prior to the day of the accident, Boy's primary job had been to help install the main pipes through the walls of the buildings. He had never installed any of the drops. On the day of the accident, Boy had been instructed to make sure that each drop was the proper length so that the sprinkler head could be attached. He was to remove and replace any fitting which was not the correct length.

At approximately 2:30 p.m. on November 12, 1979, Boy was found unconscious on a fifth floor landing of the building. The Scottsdale police arrived at the scene by 3:00 p.m. and Officer Chris Bingham climbed the stairs to the sixth floor landing where he found a ladder standing. Above the doorway and in front of the ladder, a broken pipe fitting was protruding from the ceiling. Officer Bingham also found what appeared to be a piece of the broken fitting on the fifth floor landing.

Based on his investigation of the accident scene and the physical evidence, Officer Bingham concluded that Boy had been standing on the ladder working on the fitting above the door on the sixth floor. He believed that the fitting broke while Boy was working on it and Boy fell to the fifth floor landing. There were no eyewitnesses to the accident, however, and Boy, having suffered a severe injury from the accident, has no memory of anything that occurred

on that day. According to Boy, if he had been performing the job of sizing the drop on the sixth floor landing, he would have been applying pressure to the reducer with a pipe wrench in order to remove the drop.

Expert witnesses for both sides who examined the fitting agreed that a load placed on the fitting at a prior time, presumably when the drop had originally been installed, had caused the fitting to fracture. There were two longitudinal fractures which were 180 degrees apart and which ran parallel to the axis of the pipe directly under the teeth marks left by a pipe wrench.

The second stage of the failure of the fitting presumably occurred when Boy was attempting to remove the fitting on November 12, 1979. As he applied pressure to loosen the drop, the fitting fractured around its circumference. The circumferential fracture ran from one to the other of the prior longitudinal fractures causing a piece of the fitting to break off.

The experts agreed that the longitudinal fractures were caused by the fitting being subjected to greater torque than it could withstand. They disagreed, however, on whether normal force had been applied to tighten the fitting or whether the fitting had been abused by a force greater than it could be expected to withstand. They also disagreed on how much force a fitting should be capable of withstanding without breaking.

Boy's experts testified that there were six defects in the transition area of the fitting, which made the transition area too weak to withstand a normal load applied by a pipe wrench. The experts testified that three of the defects were defects in the *design* of the thin wall section of the reducer and three were defects that occurred during the *manufacture* of this particular reducer.

Although the bulk of the testimony at trial was devoted to whether or not the fitting was defective and unreasonably dangerous, ITT also disputed that the subject fitting was an ITT fitting since its logo was not present on any of the pieces pro-

duced at trial. ITT also questioned whether the fitting produced at trial was in fact the fitting which broke at Scottsdale Shadows since there had been a breakdown in the chain of possession. Because the only evidence of how the accident occurred was circumstantial, ITT also argued several variations as to how the accident might have occurred. Boy's case was impeded by the fact that pieces of the subject fitting which had been cut off by one of plaintiff's experts had been lost. Finally, Boy was unable to produce the part of the fitting which had broken off at the time of the accident because it had been impounded and later discarded by the Scottsdale police.

## ADMISSION OF SAFETY HISTORY EVIDENCE

Initially, Boy argues that the trial court erred in admitting evidence of the absence of previous injury or property damage resulting from the use of the ITT reducer. ITT sought to admit testimony of one of its engineers, Ara Nalbandian, that over the fifty years the product had been on the market, the company had not received any complaints that the reducer had caused either injury or property damage. ITT argued that this safety history evidence was relevant to the issue of whether the product design was defective or unreasonably dangerous. ITT argued that the evidence should be admitted to rebut testimony presented by Boy's co-worker, Mark Ashton, who testified that in his experience as a pipe fitter, approximately three to four out of every 500 of the ITT reducers he had used in his work had broken when normal pressure from a wrench had been applied to them.

Boy objected to admission of the safety history, both in a motion *in limine* and later at trial, when ITT's counsel began questioning Nalbandian on this subject. Boy argued that safety history is not relevant to the issues of whether the design and manufacture of the product were defective and unreasonably dangerous. Alternatively, he argued that even if the evidence was relevant on the issues of defective and unreasonably dangerous design, such collateral evidence would confuse the jury and the jury would not be able to limit consideration of the evidence merely to those issues to which the evidence was relevant. Finally, Boy objected to the foundation for the proffered evidence, arguing that there was no showing that Nalbandian had taken the steps to acquaint himself with whether other persons had experienced problems with the product throughout the years it had been in use.

The trial court allowed the evidence in, ruling that while it was not admissible to show ITT's lack of knowledge that fittings broke, it was admissible on the issues of whether the design was defective and unreasonably dangerous. The court gave a cautionary instruction to the jury at the time the evidence was admitted that it was supposed to consider the evidence only as to whether the product was unreasonably dangerous, and that defendant's lack of knowledge of any defect was not a defense to the action.

The Arizona Supreme Court, in *Jones v. Pak-Mor Mfg. Co.*, 145 Ariz. 121, 700 P.2d 819 (1985), has recently issued a definitive opinion regarding the admissibility of evidence of the safety history of a product which is dispositive of this case. The plaintiff in *Pak-Mor* was injured while working on a refuse compaction and collection machine manufactured by Pak-Mor Manufacturing Company. He sued Pak-Mor alleging improper design of the machine and sought recovery on theories of negligence and strict liability. The trial court granted the plaintiff's motion to exclude all evidence of the absence of prior, similar accidents. The defendant had argued that the evidence was relevant to show that the design was not defective, that the product was not unreasonably dangerous, and that the defendant had no notice of any defect or danger. After verdict and judgment for the plaintiff, the defendant appealed, claiming that the exclusion of safety history was error.

After studying the criticisms that have been leveled at the established rule of *per se* inadmissibility of the absence of prior accidents, the court concluded that the rule of *per se* inadmissibility is not compatible with modern principles of evidence. It observed that there can be no doubt that evidence of safety history is relevant in defective design cases, whether the claim is in negligence or strict liability. Thus, plaintiff's objection based on the irrelevance of safety history in strict liability actions is groundless. As the court stated:

> Rule 401 defines 'relevant evidence' as that 'having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' The essence of a negligence action based on defective design is that defendant distributed a product when it was reasonably foreseeable that its design presented an unreasonable risk of harm. In a strict liability action, the plaintiff must prove that the product was defective and unreasonably dangerous. The factors which bear upon this determination in a defective design case were considered by us in *Byrns v. Riddell, Inc.*, 113 Ariz. 264, 550 P.2d 1065 (1976). One of those factors is the likelihood that the product, as designed, will cause serious injury. *Id.* at 267, 550 P.2d at 1068. Thus, in product liability actions based on defective design, relevant issues may include whether defendant should have foreseen the potential for danger from use of the product as designed, whether a defect existed, and whether a particular danger was unreasonable—including the likelihood of its causing serious injury. Safety history, including the presence or absence of prior accidents under similar use, is evidence which may make these ultimate facts 'more probable or less probable than [they] would be without the evidence.' There can be no doubt that evidence of safety history is relevant.

700 P.2d at 823 (footnote and citations omitted).

The court made it clear that the rule to apply in determining whether to admit evidence of safety history is Rule 403, Arizona Rules of Evidence, which requires the trial court to determine whether the probative value of evidence is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." In arriving at a decision the trial court must weigh many factors, including the difficulty of meeting an allegation that there have been no prior accidents.

The court noted that the ultimate issue for the trial court to consider in determining whether to admit the safety history evidence is whether the particular evidence offered is relevant to establish "evidentiary facts from which it may be inferred that there have been no prior accidents, thus warranting the ultimate inference that the product was neither defective and unreasonably dangerous nor the cause of the injury." 700 P.2d at 825. Discussing the heavy burden that the defendant carries on this issue, *Pak-Mor* explained how it can be met:

> Thus, the proponent of the evidence must establish that if there had been prior accidents, the witness probably would have known about them. This portion of the evidentiary predicate will, in most cases, be *formidable*. It is not, however, insurmountable. The defendant may have established a department or division to check on the safety of its products and may have a system for ascertaining whether accidents have occurred from the use of its products. The defendant or its insurers may have made a survey of its customers and the users of its product to determine whether particular uses of the product have produced particular types of injuries. Information may have been compiled by and obtained from governmental agencies such as the Consumer Product Safety Commission, the FAA, the FDA, or the FTC. Defendant may have established a system with its

insurers, distributors, or retailers whereby retail customers are encouraged to report accidents, accidents are investigated, and data is compiled. Any of these methods, or others, may produce facts with which the proponent of the evidence may establish that if there had been accidents or near-accidents when the product was used in a relevant manner, defendant probably would have learned of the information and would have it available. *Thus, if the import of the evidence is no more than testimony that no lawsuits have been filed, no claims have been made, or 'we have never heard of any accidents,' the trial judge generally should refuse the offered evidence since it has very little probative value and carries much danger of prejudice.*

700 P.2d at 825 (footnote omitted, emphasis added).

 ITT points to the following testimony of Nalbandian as sufficient foundation:

Q Okay. When you say that you are the manager of that section, what are your jobs? What do you do as manager?

A As a Manager I, in the product development, we are responsible in developing the products which are new and maintaining the products, fitting products, which have been manufactured and are being manufactured presently.

Furthermore, we are responsible to the avantgarde for the product line being cognizant of what is the market as far as technical developments, the competition, the uses, the abuses, or any other thing that is fed back to us to either improve or make the necessary adjustments to help the market situations get the best possible general use.

Q Ara, if there is a—if the people out in the world that are using one of the products that comes under pipe fitting section is experiencing difficulty or problems, will you become aware of that?

A Yes.

\* \* \* \* \* \*

Q What is the reason that you will be made aware of problems that are devel-

oping with ITT products under your area?

A Well, if, for example, if we have made certain products and the customer has a specific requirement and he wants to have a product to be used and to be used in such a manner that it is going to give them the satisfactory performance or if he has some trouble in getting something worked out or he has had some other problem that he can't really understand, usually technical, would be able to sort of help him in getting the customer satisfied.

Q What is your specific duty if you find someone, for example, is having problems with one of these ITT fittings breaking on a regular basis?

A Well, we do the failure analysis and we ascertain the problems associated with the situation and if there is a remedy, or recognizing the problem, we take a corrective action or we recommend the jobber or the person who has had difficulty to follow certain procedures that will make it better.

\* \* \* \* \* \*

Q Tell the jury why you were familiar with [ITT's] fire protection operation.

A During my initial start with Grinnell, which was in 1966, at that time we had the fire protection division within our compound. Their research group was also in association with us which meant that we were in the same group. Since I was responsible for the pipe fitting end of it, we had direct communication and involvement on their requirements, problems, needs, and the developments that they required.

My task was to be involved in their needs, know exactly what their businesses are, know exactly how the customers responded or required or associate myself with the industries exactly, the development as to the market needs then.

Q During that time, Ara, did you have frequent occasion to actually go into the field and see how these installations

were being used and to help supply the needs?

Q Ara, I asked you earlier whether you would be the person at ITT who would be required to know if the company was having problems with these products and, specifically, this one by three-quarter inch product breaking in use. Would you have such a knowledge if breakage was occurring and being reported back to the company?

A Yes.

Q Ara, have you, during the time that you have been with the Grinnell and since 1973, been responsible for being aware of how your product performs in the marketplace?

A Yes.

Q Are you also the person, if there is a problem, developing, that is, that is responsible for instituting whatever corrective action may be necessary?

A Yes.

ITT's reliance on these answers from Nalbandian is misplaced, for his responses fail to meet the "formidable" evidentiary predicate required by *Pak-Mor*. Indeed, Nalbandian's testimony suffers the very shortcoming that *Pak-Mor* cautioned about: it failed to show that if there was information available about accidents, that Nalbandian would have known of such information. He vaguely referred to trips to the field which were unsystematic and apparently sporadic. This testimony failed to reflect in the least just how large a sample of ITT parts was encompassed in his assessment.

Common sense suggests that users might not complain about a defective item that costs only one dollar. Consumers might take a loss on the item, rather than take the time and spend the money to bring the defect to ITT's attention. This is precisely the type of evidence which *Pak-Mor*

concluded should be excluded because "it has very little probative value and carries much danger of prejudice." *Pak-Mor, supra.*

Our conclusion is equally applicable to ITT's contention that the safety history was admissible rebuttal testimony. Regardless of the purpose of the evidence, the trial court's decision runs afoul of the dictates of Rules 401 and 403 as interpreted by *Pak-Mor*. An adequate foundational predicate must be laid.

The admission of the safety history was reversible error. It is entirely possible that the verdict might have been in favor of appellant had the safety history not been admitted. While ITT introduced a number of experts who testified in a theoretical manner as to the absence of any defects in the ITT product, the safety history corroborated those experts by providing a practical basis for the contention that the product was without flaw. ITT admitted in its argument for a directed verdict that there was sufficient evidence that the reducer was either defectively designed or manufactured to take the case to the jury. Where improper testimony is admitted into evidence, prejudice is presumed. *Valley Transportation System v. Reinartz*, 67 Ariz. 380, 383, 197 P.2d 269, 271 (1948). We will not indulge the assumption that this evidence had no effect on the verdict. Since the case must be retried, we will address questions which may arise again.

## JURY INSTRUCTIONS

The parties do not agree on how to instruct the jury on the definition of an "unreasonably dangerous" product due to a design defect.

The trial court properly instructed the jury on the elements that Boy had the burden of proving:

(1) That the product was defective at the time it was manufactured and sold.

(2) That the defect was such that it caused the product to be unreasonably dangerous for its intended or foreseeable use.

(3) That the defect was a proximate cause of the plaintiff's injuries and damages.

(4) The amount which will reasonably compensate the plaintiff for his injuries and damages.

R.A.J.I., Prod. Liability # 4, *as modified by Byrns v. Riddell, Inc.,* 113 Ariz. 264, 550 P.2d 1065 (1976).

The trial court then instructed the jury regarding the definition of the key terms— "proximate cause," "defective," and "unreasonably dangerous." Boy requested that the trial court instruct the jury that "[a] product is defective and unreasonably dangerous if it fails to perform as safely as an ordinary user would expect when the product is used in an intended or reasonably foreseeable manner." The proposed instruction made no distinction in meaning between the terms "defective" and "unreasonably dangerous." ITT also requested a similar instruction defining defective and unreasonably dangerous in terms of reasonable expectation. ITT made no attempt to persuade the court to define the phrases in terms of the risk/benefit analysis that the court ultimately adopted and which we discuss later. Instead of giving these instructions, the trial court deleted the words "and unreasonably dangerous" from the instruction and gave the modified instruction as a definition of "defective", to wit: "A product is defective if it fails to perform as safely as an ordinary user would expect when the product is used in an intended or reasonably foreseeable manner."

Over Boy's objection the trial court then gave its own instruction defining "unreasonably dangerous" in terms of the seven-factor analysis cited in *Byrns v. Riddell, Inc., supra:*

In determining whether a defect, if any, is unreasonably dangerous, you should consider: (1) the usefulness and desirability of the product, (2) the availability of other and safer products to meet the same need, (3) the likelihood of injury and its probable seriousness, (4) the obviousness of the danger, (5) common knowledge and normal public expec-

tation of the danger (particularly for established products), (6) the avoidability of injury by care and use of the product, and (7) the ability to eliminate the danger without seriously impairing the usefulness of the product or making it unduly expensive.

Boy contends that under the circumstances of this case it was error to give this instruction. We agree.

The risk/benefit analysis used to determine if a defect is unreasonably dangerous was first alluded to in Arizona case law in *Byrns v. Riddell, Inc., supra.* The court in *Byrns* discussed the difficulty of defining the term "unreasonably dangerous" in defective design cases. The court observed that the *Restatement (Second) of Torts* § 402A provides a definition of "unreasonably dangerous" in Comment (i):

The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.

113 Ariz. at 267, 550 P.2d at 1068.

The court also quoted the above-mentioned seven-factor analysis. The *Byrns* court did not say when one test should be used rather than another. It did indicate that the seven-factor analysis was one approach to the question of whether a defect is unreasonably dangerous. The court cautioned, though, that "[n]o all encompassing rule can be stated with respect to the applicability of strict liability in tort to a given set of facts. Each case must be decided on its own merits." 113 Ariz. at 267, 550 P.2d at 1068. The seven-factor analysis approach is obviously one in which the risks of danger are balanced against the benefits to be gained from using the product.

In *Brady v. Melody Homes Mfr.,* 121 Ariz. 253, 589 P.2d 896 (App.1978), this court considered the question of when a risk/benefit analysis, as opposed to the consumer expectation approach, should apply in a design defect case. We observed that the consumer expectation test would not apply when the consumer would not

know what to expect from a product because he had no idea how safe the product could be made. 121 Ariz. at 257, 589 P.2d at 900. We indicated that in that type of case the risk/benefit analysis should be used.

■ Boy is correct when he points out that the risk/benefit analysis is appropriate in a design defect case only when the consumer expectation standard is inappropriate or insufficient. *See Brady, supra; Hohlenkamp v. Rheem Mfg. Co.*, 134 Ariz. 208, 211, 655 P.2d 32, 35 (App.1982). Although Boy was relatively inexperienced in working with reducers, he nevertheless had sufficient familiarity with the product to have developed the expectation that it would not break in ordinary use. He testified that in the three months he had worked with these fittings he had never had one break. One of Boy's witnesses also testified that while this type of fitting occasionally broke when he used it, he did not expect such incidents when he worked with the item.

Under current Arizona law the consumer expectation test is the appropriate one for a manufacturing defect, as opposed to a design defect. If something goes wrong in the manufacturing process, the result is a product which the manufacturer did not intend and which could hardly be contemplated by the consumer. *Brady, supra.* For these reasons it was improper to give the risk/benefit instruction.

## INSTRUCTION ON MISUSE

■ Boy argues that the trial court erred in instructing the jury on the affirmative defense of misuse. The trial court instructed the jury that the verdict should be for the defendant if they found by a preponderance of the evidence that plaintiff's accident was caused by a use of the product in a manner other than that which was reasonably foreseeable. He contends that there was no evidence that the subject fitting had been misused and therefore that it was error for the trial court to instruct the jury on the affirmative defense of misuse.

Boy's experts at trial testified that in their opinion the subject fitting had not been overtightened or abused in any manner. He points out that defendant's experts did not testify that the subject fitting had been abused and therefore argues that there was no evidence of abuse of the subject fitting. ITT's rejoinder is that its whole case was based on showing misuse and that the evidence it presented was sufficient to merit a jury instruction on misuse. We agree with ITT that the evidence it introduced supported a misuse instruction.

The fact that defendant's experts were unable to say from looking at the subject fitting that it had been misused is not determinative. While a small portion of the testimony at trial dealt with whether there were manufacturing defects in the subject fitting, the bulk of the testimony bore on the question of whether there were design defects in the product. Experts for each side had opinions on how strong the fitting should be and had conducted tests on identical ITT reducers to determine the amount of force needed to break the fitting. ITT's experts were able to testify that from the tests they conducted the fitting would not break when force approximately four times the amount necessary to make the fitting leak-tight was placed upon it. They testified that the ITT fittings broke at loads comparable to the loads required to break similar fittings made by other manufacturers. They said that this allowed an adequate factor of safety.

Although the parties' experts presented conflicting evidence on these issues, we conclude that ITT presented substantial evidence that its $1 \times \frac{3}{4}$ inch reducer would withstand a normal load placed on it to make it leak-tight. ITT's experts placed the issue of misuse squarely before the jury by their testimony that the reducer could have broken only by misuse. While Boy may argue that defendant's experts did not conduct proper tests to make this determination, the validity and usefulness of the tests were simply factors for the

jury to consider in deciding which testimony to accept.

## PROPOSED INSTRUCTION ON VIOLATION OF INDUSTRY STANDARDS

■ Boy argues that the trial court erred in refusing his jury instruction that the defendant's violation of applicable industry standards was evidence that the subject fitting was defective and unreasonably dangerous. Boy had requested the following instruction:

> You may consider the violation of any applicable standards as evidence that the product is defective and unreasonably dangerous.

We agree with ITT that the instruction was properly refused. As phrased it is a comment on the evidence because it tells the jury how to apply a finding, i.e., it tells them that the product is defective if it is not in compliance with the standards.

Moreover, while the evidence at trial indicated the fitting did not comply with the American National Standards Institute's length standards, the evidence was conflicting as to whether this was in fact a safety standard. Defendant's experts had testified that the length standard was for convenience of the users of the product, not for safety purposes. The instruction was properly refused because it told the jury that they could find the product defective and unreasonably dangerous if it violated *any* applicable standard, without limiting it to safety standards. The instruction assumed as true a fact which was in dispute and was therefore properly refused. *See, e.g., Soto v. E.W. Bliss Div.,* 116 Ill.App.3d 880, 72 Ill.Dec. 319, 452 N.E.2d 572 (1983).

■ We do not mean to say that upon retrial no instruction of this type can be given. In *Hohlenkamp v. Rheem Mfg. Co., supra,* Division 2 of this court stated that evidence of applicable industry standards, including those of the American National Standards Institute, are admissible since they constitute substantive evidence on the issues of whether the product is defective and unreasonably dangerous. It is true that the *Hohlenkamp* case says nothing about the propriety of giving a jury instruction regarding the effect of a violation of industry standards. Our review of the relevant case law reveals that in design defect cases, the trial court can properly instruct the jury on compliance or noncompliance with industry standards. *Reed v. Tiffin Motor Homes, Inc.,* 697 F.2d 1192, 1198 (4th Cir.1982); *Raney v. Honeywell, Inc.,* 540 F.2d 932, 938 (8th Cir.1976). Such an instruction is relevant to a determination of whether the product as designed is defective or unreasonably dangerous. *Reed, supra; Raney, supra.*

We believe that the admission of evidence of this nature requires the court to give some guidance to the jury with respect to how to use it. An instruction which advises the jury that they may consider a violation of safety standards, if any, together with all the other evidence in determining whether the product was defective and unreasonably dangerous and that the weight to give such evidence is up to them, might be appropriate.

Based upon the foregoing, we reverse and remand for a new trial.

CONTRERAS and OGG, JJ., concur.

## SUPPLEMENTAL OPINION

KLEINSCHMIDT, Judge.

On August 15, 1985, this court filed an opinion in this matter which reversed the trial court's judgment and remanded the matter for new trial. A review of the appellee's motion for reconsideration, appellant's response thereto, and the supreme court's decision in *Dart v. Wiebe Manufacturing, Inc.,* 147 Ariz. 242, 709 P.2d 876 (1985), decided after the original opinion in this case was filed, suggests that we need to further address the issue of jury instructions.

The appellant presented evidence at trial that the pipe fitting could have been defectively manufactured, defectively designed, or both. The trial judge gave a "risk/benefit" instruction. That instruction does not

properly apply to the plaintiff's claim that there was a manufacturing defect in the fitting. *Dart* strongly indicates that in cases where a manufacturing defect is alleged, a "consumer expectation" instruction should be given. *Dart,* 147 Ariz. at 244, 709 P.2d at 878. Our opinion is thus in accord with *Dart* on this issue, and appellee's motion to reconsider is accordingly denied.

*Dart* further indicates that a risk/benefit instruction is proper in design defect cases when a consumer expectation instruction would be inappropriate, such as when the consumer would not know what to expect from the product because he would have no idea how safe the product could be made. *Dart,* 147 Ariz. at 244, 709 P.2d at 878. Given that a consumer would probably not know what to expect with regard to the safe design of a pipe fitting, had appellant's claim merely been a design defect claim, the instruction actually given to the jury would have been proper.

■ If on retrial appellant presents a prima facie case on both a manufacturing defect and a design defect, and the evidence indicates that the appellant had no expectation with respect to the design of the product, the trial judge should give two instructions—the consumer expectation instruction on the manufacturing defect claim and a risk/benefit instruction on the design defect claim. *See Dart,* 147 Ariz. at 248, 709 P.2d at 882. In no event should the jury's determination of whether there was a manufacturing defect be framed by a risk/benefit instruction.

We have considered appellee's discussion in its motion for reconsideration on the admission of safety history evidence, and we deny the motion.

Opinion modified; motion for reconsideration denied.

CONTRERAS and OGG, JJ., concur.