NORMAN DAVENPORT *v.* WHITE MOUNTAIN POWER COMPANY.

*Demond, Sulloway, Piper & Jones* (*Mr. Piper* orally), for the plaintiff.

*Mayland H. Morse* and *George R. Grant, Jr.* (*Mr. Grant* orally), for the defendant.

PAGE, J. The plaintiff owned and operated a garnet mill in Wilmot. During the night of January 6, 1939, the mill was destroyed by fire and the contents damaged. There is no serious disagreement that the first of the series of events that led to these results was the lodging of a birch tree, during an ice-storm, upon the wires of the defendant serving the mill. It could be found that two of the defendant's high-voltage wires consequently broke, and that one or both of them fell upon the private telephone wires maintained by the plaintiff. These telephone wires were strung upon the same poles that carried some private power wires maintained by the plaintiff, but in which there was no current at the time. The telephone wires led into the mill, which was a wooden frame building. The outside walls were covered with metal sheathing.

There is a dispute in the evidence as to what next happened. The plaintiff produced evidence that his telephone system was properly constructed and maintained, that the defendant was negligent in maintaining its transmission line, and that consequently the fall of the high-tension wires on the telephone wires created an arc from the latter to the metal sheathing and caused the fire. The defendant produced evidence to support the theory that the arc to the sheathing was due to the contributory negligence of the plaintiff in the construction and maintenance of his private telephone system.

Upon this evidence, it was for the jury to say which chain of events led to the fire. Adopting the plaintiff's theory, the jury were presented with the question whether reasonably prudent men, under the circumstances, would have cut or guyed the birch tree so that it would not come into contact with the defendant's wires. Here again, the testimony was in conflict, and the jury were warranted in finding that the defendant was negligent in that respect.

While the plaintiff had some knowledge of such situations superior, perhaps, to that of the average man, and while the tree grew on his own land, the maintenance of the defendant's line was primarily the defendant's lookout. Moreover, the tree was on the defendant's "right of way," which was separate from the plaintiff's "right of way," which crossed the defendant's at some distance from the point where the birch tree stood. It follows that the jury were not bound to find the plaintiff negligent in not anticipating the danger from the birch tree and in not taking steps to have it removed. The motions for a nonsuit and for a directed verdict were properly denied.

The defendant's manager was asked by the plaintiff's counsel, "You say before the fire you never looked at any telephone installation of Mr. Davenport's in and around the mill?" Upon objection that there was no obligation on the part of the defendant's manager to examine the plaintiff's equipment, the question was admitted, subject to exception. The question was then read to the witness, and again it was objected that there could be no duty to enter the mill. During the ensuing colloquy, the plaintiff's counsel again used the words "particularly in and around the mill." Then occurred the following: "*Mr. Morse:* We don't go into the mill. *Court:* You don't mean inside the mill. *Mr. Sulloway:* No. *Court:* Ask the question again and it will be admitted subject to exception." The question was then read once more, and the witness answered in the negative.

It may be granted that the defendant's servants had no duty, in this particular instance, to examine the plaintiff's telephone installation inside of the mill. The plaintiff's counsel plainly admitted that in the presence of the jury. It is therefore difficult to see what prejudice could befall the defendant because of the wording of the question. It does not appear that the court permitted the plaintiff's counsel to argue, or the jury to infer, that there was any duty of inside inspection. As far as appears it was properly left to the jury to infer that the defendant might be negligent if its manager was ignorant of obvious exterior risks such as the place and manner of the entrance of the telephone wires into the metal-sheathed mill. As to this, the witness had already admitted his ignorance, and ignorance might be found to be negligent. *Frear* v. *Company,* 83 N. H. 64, 66.

The plaintiff was asked in cross-examination concerning his maintenance of his private power transmission line. As to a photograph, he said, "I would say it is a fair sample of the way we maintained the line." Further questions along this line were excluded as immaterial, and the photograph was not admitted. The practice of the plaintiff in constructing and maintaining his own private power line was not material. It had no tendency, under the circumstances, to show the general custom of public utilities; but only the degree of care that the plaintiff took of his own property. What the plaintiff did for his own protection and for the protection of his property has no part in making the rule of conduct applicable to the defendant. This is especially true because the plaintiff's power wires were never charged except when the mill was being

operated by energy carried over them, and never at night; while the defendant's wires were charged night and day, and whether the mill was being operated or not.

The defendant's manager, called as a witness by the plaintiff, gave direct testimony as to his experience with other lines of the defendant. On cross-examination he was asked how the line in question compared as to birch trees with similar lines in New Hampshire. The plaintiff objected on two distinct grounds: first, because it did not appear that the witness was familiar with any lines other than the defendant's; second, because the question was not limited to maintenance of similar lines under similar conditions. Both limitations are recognized to the rule that evidence of the custom of others is receivable as some evidence of what is due care. 2 Wigmore, Evidence (3d *ed.*), *s.* 461. No ruling as to the first ground of objection was obtained, and no question of law is presented. As to the second, the defendant's counsel declined to show similarity of conditions which would make the evidence relevant. When it was excluded as "unrelated," it must be considered that the court thought it irrelevant because there was no evidence of similarity of conditions. If the question had been admitted under these circumstances, it would have been cause for setting aside a verdict for the defendant, if that had been returned. *Palmer* v. *Edgerly*, 87 N. H. 391.

An expert introduced by the defendant was asked by the defendant's counsel whether he was familiar with the brushing out requirements of the Rural Electrification Administration. Upon an affirmative answer, he was asked "whether the brushing out of this line comes well within the requirements of the Rural Electrification Administration requirements." The question was excluded, subject to exception. The question was properly excluded because not based upon conditions similar to those existing at this cross-over with reference to span and sheathing. Moreover, the administration performs the functions of a bank. It does not construct or maintain electric lines. 7 U.S.C.A. *ss.* 901–957. Minimum standards required by a banking institution as the test of loanability have no relevancy to establish what the average person engaged in the electrical business does under particular circumstances. When it is recalled that due care may require more precautions than any particular operator chooses to adopt, or even than general custom adopts (*Bouley* v. *Company*, 90 N. H. 402), it is readily perceivable that even general banking practice (much less the practice of one bank)

in making loans to operators is too remote to be of aid to the jury.

It should also be added that it is a matter of common knowledge that the coöperative systems to which the Rural Electrification Administration makes loans are designed to furnish service that other utilities cannot afford to furnish, and therefore their practices are hardly evidence of what is proper practice for the defendant. Further than that, their coöperative character (Laws 1939, c. 212) makes their practice evidence at most of what they choose to do for the mutual protection of their members, rather than evidence of the standard of care required for those undertaking service for the general public. In this respect, their practice is no more relevant than that of the plaintiff in maintaining his private line.

Upon direct examination, the plaintiff testified that as a part of the purchase money for the property, he discharged unpaid tax liens on the property amounting to $3,111.27, for the years 1932 to 1934 inclusive. The payment was made in 1935. He had just testified, when asked what he paid for taxes when he bought in 1935 that the amount was $288.35. This was due to an obvious misunderstanding as to the nature of the question asked. On cross-examination, it appeared that this sum of $288.35 represented his share as owner of the taxes for 1935, and that there was a further sum paid by him as taxes for that year, apparently as a part of the purchase price. Upon objection, the testimony as to 1935 taxes was stricken out and the jury charged that all taxes for 1935 and subsequent years were not to be considered. If a portion of the 1935 taxes were in fact a part of the purchase price, this went further in the interest of the defendant than was necessary. *Laird* v. *Railroad*, 80 N. H. 58.

The defendant offered evidence that the plaintiff carried only $8,000 of fire insurance on the mill and equipment. The offer was made for two purposes: (1) as evidence of the value of the premises, and (2) to impeach the plaintiff, who had testified that he thought the property worth well above $50,000. As to the first purpose, the evidence was properly excluded. *Adelphia &c. Co.* v. *Company*, 277 Fed. 905; *Day* v. *Railroad*, 225 Mass. 538. So also, for the purpose of impeachment. The fact that the plaintiff bought only $8,000 of insurance bears only conjectural relationship to the owner's belief about value. Whatever his own opinion of value, the insured may desire to carry the risk, either in whole or in part, whether because of high rates or for some other reason. What the insurer

thought about value, if expressed by the amount written, would be no more admissible than the assessed valuation. Moreover, the amount written is only conjectural evidence of the insurer's estimate of value, since the insurer may not care to contract for more than nominal coverage, his conclusion possibly depending on a variety of judgments as to the particular risk, including the use of the property, its combustibility, its protection by watchmen at night, its remote location in the hills, and its distance from fire-fighting facilities.

The defendant has not briefed exceptions to the denial of its requests for instructions, and they are understood to have been waived.

The claim of the defendant that the verdict is excessive as a matter of law cannot be sustained. The plaintiff bought the property at auction sale on foreclosure in 1935. He was the only bidder present. Its cost, including his bid, the tax liens and repairs immediately made, was less than $8,000. This was not conclusive as to the value. At the time of the fire, there was stock in trade on hand which, according to the evidence, it would cost over $8,500 to reclaim.

The plaintiff placed a value on the mill and contents of well above $50,000. One of his experts placed the value at nearly $50,000. A building expert testified that the cost of reproducing the mill (without foundation) was more than $12,000, after depreciation. There was evidence that the machinery and equipment were worth nearly $27,000.

It is therefore not conclusive that the jury acted improperly when they returned a verdict for $29,800. *Wisutskie* v. *Malouin*, 88 N. H. 242, 246.

*Judgment on the verdict.*

BRANCH, J., did not sit: the others concurred.