Paul PIERCE, Respondent,

v.

**PLATTE–CLAY ELECTRIC COOPERATIVE, INC.,**
Appellant.

No. 70947.

Supreme Court of Missouri,
En Banc.

May 16, 1989.

Spencer J. Brown, Daniel E. Hamann, Kansas City, for appellant.

John K. Thomas, St. Joseph, for respondent.

ROBERTSON, Judge.

We granted transfer in this case, primarily to consider whether a plaintiff must establish a defendant's violation of industry standards in order to meet his burden of proof in a negligence action. We answer the question in the negative and affirm both consistent precedents of this Court and the judgment of the trial court.

## I.

Respondent, Paul Pierce, brought suit against appellant, Platte–Clay Electric Cooperative, Inc., (Platte–Clay) for personal injuries caused by the electric cooperative's alleged negligence. Pierce, a farmer, raised cattle, hogs, tobacco and various row crops near DeKalb, Missouri. Platte–Clay distributes electric power to seven counties in Missouri. Most of the electric power is distributed through overhead lines suspended from poles owned by the appellant. Some of the poles are stabilized by guy wires which extend at an angle several feet away from the pole. The guy wires are anchored into the ground. Some poles, as in this case, serve merely to support other poles which carry the electrically charged lines. These "stub" poles are also anchored by guy wires.

On March 20, 1985, Pierce was applying anhydrous ammonia to a rented field. The tractor Pierce drove was approximately twelve feet wide and pulled a spreader which extended ten feet beyond either side of the tractor. Pierce had been in the field only one time prior to March 20, 1985, and had not walked around the field or otherwise examined it before beginning to spread the ammonia.

As he drove around the field, Pierce looked behind him to check the spreader and forward toward the ground in front of the tractor watching for ditches and rocks. He recalled seeing brush and trees in the northeast corner of the field but he did not focus his vision on them as he approached. When Pierce turned the tractor at the northeast corner to proceed south, he felt a jerk. Inspection revealed that the spreader

had snagged on a guy wire which secured a utility stub pole. The stub pole had been placed in the midst of the trees; the guy wire extended into the brush at the edge of the field. The stub pole did not carry an electrically charged line but had secured a cable that supported a utility pole across the highway. Pierce found that the stub pole was broken and that the cable was hanging down, grazing the surface of the highway.

Pierce understood the danger the cable posed to vehicles on the highway. He returned to the tractor, retrieved his tools and began to walk to the cable with the intention of removing it. As he started around the tractor, an eastbound car came into view on the highway. Pierce ran toward the highway in an attempt to flag down the car before it struck the cable. The driver did not see his warnings. Pierce testified that he heard a swishing sound and was thrown into the air. He did not see the car hit the cable nor could he testify as to what immediately followed. There was sufficient evidence that the jury could have found that the car struck the cable, which became taught and caught Pierce's right leg. Pierce was taken by ambulance to a hospital where doctors amputated his right leg below the knee. He also suffered a dislocated left shoulder and head injuries.

Platte–Clay owned the stub pole, guy wire and cable involved in respondent's accident. The pole and guy wire were erected by appellant in 1969. No guy marker (an eight-foot long brightly colored plastic marker) marked the guy wire.

Pierce's petition alleged that appellant knew or should have known that persons operating farm machinery faced an unreasonable risk of injury and that Platte–Clay was thereby negligent in failing to place a guy marker on the guy wire to warn of the wire's presence.

Platte–Clay adopted two primary defense positions throughout trial: First, the cooperative claimed that the bizarre chain of events that led to Pierce's injury were un-

foreseeable to appellant. Second, even if the events were foreseeable, appellant claimed it followed the standards of the National Electric Safety Code and therefore was not negligent.

The jury returned a verdict for Pierce, assessed his damages at $600,000 and apportioned Pierce's fault at 50 percent. The trial court entered judgment in favor of respondent Pierce for $300,000.

The Court of Appeals, Western District, reversed and remanded on two bases: First, appellant argued, and the court of appeals held, that Pierce improperly relied on Rural Electrification Administration (R.E.A.) bulletins to establish a violation of industry custom or standards. The court of appeals determined that the bulletins were irrelevant and their use during trial prejudiced the cooperative. Second, the court of appeals held that respondent failed to show a violation of industry custom or standard, and, therefore, that respondent failed to make a submissible case of negligence.

We granted transfer and have jurisdiction. Mo. Const. art. V, § 10.

## II.

### Industry Standards

#### A.

To make a submissible case of negligence, a plaintiff must prove, *inter alia,* that the defendant breached a duty of care. A duty is a requirement to conform to a standard of conduct for the protection of others against unreasonable risks. *Hoover's Dairy, Inc. v. Mid–America Dairymen,* 700 S.W.2d 426, 431 (Mo. banc 1985); W. Prosser and W. Keeton, *Prosser & Keeton on the Law of Torts,* § 30 p. 164 (5th ed.1984). In this case, the parties held conflicting views as to the standard of conduct the electric cooperative was required to follow.

Respondent Pierce attempted to prove that appellant breached its duty of ordinary care [1] by failing to place a marker on the

---

1. The guy wire, stub pole and the cable struck by the car all were merely support structures

and did not carry electrical current. Since the circumstances of this accident did not involve

guy wire. Appellant argues that it was not required by the National Electric Safety Code (NESC) to place a marker on a guy wire near a cultivated field.[2] Appellant claims its compliance with this industry safety standard is a complete defense.

Evidence of industry custom or standard is admissible proof in a negligence case. *Kungle v. Austin,* 380 S.W.2d 354, 361 (Mo.1964). That the evidence is admissible does not terminate the inquiry, nor does evidence of conformance to such standards require a conclusion that a defendant did not breach its duty to the plaintiff.

In *Hannah v. Mallinckrodt, Inc.,* 633 S.W.2d 723 (Mo. banc 1982), the defendant maintained that the plaintiff had the burden to prove that defendant deviated from industry safety customs to make a submissible case of negligence. This Court rejected that argument. "[A] person charged with negligence cannot excuse his misconduct by proving the same misconduct in others—custom furnishes no excuse if the custom itself is negligent." [Citations omitted.] *Id.* at 725.

In *Freeman v. Kansas City Power and Light Co.,* 502 S.W.2d 277 (Mo.1973), this Court found the NESC to be an admission of a minimum standard of conduct within the electric industry. Compliance with that minimum was not, however, conclusive of a defendant's adherence to its duty of care. *Id.* at 283.

The duty of care is an objective standard determined by what an ordinary careful and prudent person would have done under the same or similar circumstances. Industry customs or standards do not establish a legal standard of care. *Fancher v. Southwest Missouri Truck Center, Inc.,* 618 S.W.2d 271, 274 (Mo.App.1981). Were we to permit industry standards to establish the legal standard of care, we would also permit industry to dictate the terms under

which its members could be held liable for negligence.

Tort law serves a different purpose. As Justice Holmes said:

> What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not.

*Texas & Pac. Ry. Co. v. Behymer,* 189 U.S. 468, 470, 23 S.Ct. 622, 623, 47 L.Ed. 905 (1903). Appellant conducted a defense equating compliance with the NESC with the exercise of ordinary care. In this case, the jury found that appellant breached its standard of care, in essence rejecting appellant's argument that the NESC standards met the ordinary careful and prudent person standard.

■ Consistent with this Court's precedents, we again hold that evidence of industry standards is generally admissible as proof of whether or not a duty of care was breached. However, compliance with an industry's own safety codes or standards is never a complete defense in a case of negligence. A plaintiff is, therefore, not required to prove a violation of industry standards to make a submissible case.

### B.

■ Missouri courts have rarely confronted the particular kinds of evidence used to prove electric industry standards and have never specifically addressed the use of Rural Electrification Administration (REA) bulletins. Appellant urges that these bulletins are irrelevant and do not prescribe the standard of care appellant was obligated to follow. Pierce counters that the bulletins were relevant because the evidence proved that appellant's policy was to comply with REA recommendations.

From opening statement to closing argument, appellant attempted to persuade the jury that the National Electrical Safety

---

the inherently dangerous properties of electricity, the "highest degree of care" standard which is utilized when electricity is the agent of injury is not applicable. *Poumeroule v. Postal Telegraph & Cable Co.,* 167 Mo.App. 533, 152 S.W. 114 (1912). The appropriate standard is ordinary care.

**2.** The 1984 edition of the National Electrical Safety Code provided that only guy wires exposed to "pedestrian traffic" required a "substantial and conspicuous marker not less than 8 feet long."

Code established the standard of care to which appellant's conduct must conform. On cross-examination of appellant's superintendent, respondent was able to elicit testimony that there were "certain specifications and rules under the REA that we follow." This witness had overseen the utility's operations since its inception in 1938. He admitted that the REA bulletins were considered authoritative in the field, that appellant relied on this material in developing line inspection and maintenance procedures and appellant felt compelled to comply with the REA standards.

The Rural Electrification Administration is a division of the United States Department of Agriculture and provides loans to rural electric cooperatives like Platte–Clay. Appellant's superintendent testified that before the cooperative borrows money, the utility's lines and transmissions must be in compliance with REA's engineering specifications. The REA also provides their borrowers bulletins concerning system design and safety requirements.

Pierce attempted to use relevant REA bulletins collected in appellant's files to rebut the position that compliance with the NESC was always a sufficient standard of safety. For example, in one such bulletin the NESC is referred to as a minimum standard, and cooperatives are warned that "[i]n some cases, these standards will be inadequate for local conditions." Another bulletin, relevant to the use of guy guards, contained a line inspection form complete with a checkbox for adding guy guards to existing guy wires. Pierce was able to demonstrate that this form was available to appellant in 1975 and specifically superseded an earlier form without the check for guy guards provided in 1952. However, the evidence showed that appellant continued to use the superseded form through 1980, the year that appellant last inspected the guy wire respondent hit with his tractor.

Just as the NESC does not establish the determinative standard of care, the REA bulletins do not set that standard. Yet, the REA bulletins were properly admitted as relevant evidence in rebuttal of appellant's insistence on the NESC as the appropriate standard of care and of the superintendent's testimony that the cooperative followed certain REA rules and specifications. The REA bulletins, like the NESC, are evidence for the jury to weigh in considering the proper conduct of an ordinarily careful and prudent person under the same or similar circumstances.

Appellant would have this Court adopt the reasoning of *Davenport v. White Mountain Power Co.*, 92 N.H. 20, 24 A.2d 274 (1942). This is the only apparent case in the country which discusses the relevancy of REA bulletins. The defendant in *Davenport* offered its compliance with the REA guidelines in an effort to prove it met its required duty of care. *Davenport* found the REA bulletins irrelevant as evidence of the standard of care.

To the extent that *Davenport* rejects REA bulletins as establishing the standard of care, we agree. However, we disagree with *Davenport* on the relevancy of the REA bulletins in this case. Here, appellant's superintendent testified that appellant relied on REA bulletins for line inspection and maintenance procedures; those REA bulletins are, therefore, relevant evidence for the jury to consider in weighing the issue of breach of due care in this case. Appellant's point is denied.

### III.

#### Evidence of Similar Occurrences

##### A.

Next, appellant argues that Pierce failed to prove sufficiently that the danger created by the unmarked guy wire was foreseeable. In particular, appellant contends the trial court erred in allowing Pierce to introduce evidence of appellant's "trouble tickets." A trouble ticket is appellant's record of any reported power outage or needed line repair. In the four years prior to Pierce's accident, there were nine trouble tickets concerning contact between farm machinery and guy wires. Pierce was allowed to admit two of these trouble tickets to demonstrate appellant's notice that farm machinery had struck unmarked

guy wires. Appellant contends the incidents were not substantially similar and therefore irrelevant.

▮ When evidence of other accidents is introduced to show notice of danger, the similarity in the circumstances of the accidents need not be completely symmetrical. *McCormick on Evidence*, § 200 p. 590 (3rd ed.1984). *See also* Martin, *Basic Problems of Evidence*, § 10.04(3) p. 234 (6th ed.1988). In this case, both trouble tickets introduced described incidents similar to the Pierce accident where farm machinery contacted appellant's guy wires resulting in support poles breaking. In each instance a similar trouble ticket was created. In at least one of the incidents prior to Pierce's accident, a full report was made to the cooperative's board of directors. This evidence was relevant to show that appellant was aware of the risk of farm machinery contacting unmarked guy wires and that such an event could foreseeably result in an unreasonable risk of injury.

▮ Appellant counters that evidence of other incidents in other fields is not sufficient notice that the particular guy wire and support pole at issue posed a danger. We disagree. Trial courts have wide discretion on issues of admission of evidence of similar occurrences. *Lindsey v. Rogers*, 220 S.W.2d 937, 940–41 (Mo.App.1949); *Doyle v. St. Louis–S.F. Ry. Co.*, 571 S.W.2d 717, 726 (Mo.App.1978). Our review is limited to a finding that the trial court first satisfied itself that the evidence was relevant to an issue of the case and that the occurrences bore sufficient resemblance to the injury-causing incident, while weighing the possibility of undue prejudice or confusion of issues. *Wadlow v. Linder Homes, Inc.*, 722 S.W.2d 621, 629 (Mo.App.1986); *Blackwell v. J.J. Newberry Co.*, 156 S.W.2d 14, 20 (Mo.App.1941).

Here, the question of the admissibility of the trouble tickets was initially raised, briefed and examined in a pretrial conference. At that time, the trial court recognized the potential hazards of such evidence, but explicitly stated that the trouble tickets were relevant for the limited purpose of showing the appellant's knowledge that "people were running into unmarked guy wires."

Our review of the record reveals the trial court kept a tight rein on the examination concerning the trouble tickets. The attorneys' questions were strictly limited to the target issue of notice. Likewise, the trial court allowed appellant to rebut Pierce's evidence by demonstrating the statistical improbability of Pierce's accident in light of 12,000 other trouble tickets not related to guy wires. *See McJunkins v. Windham Power Lifts, Inc. and E. A. Martin Machinery Co.*, 767 S.W.2d 95 (Mo.App.1989). (Generally evidence of the absence of other accidents is inadmissible; however, the recent trend is to allow such evidence to rebut proof of notice of a danger, *e.g.*, *Koloda v. Gen. Motors Parts Div., Gen. Motors Corp.*, 716 F.2d 373 (6th Cir.1983); *Jones v. Pak–Mor Mfg. Co.*, 145 Ariz. 121, 700 P.2d 819, *cert. denied*, 474 U.S. 948, 106 S.Ct. 314, 88 L.Ed.2d 295 (1985); *Boy v. I.T.T. Grinnell Corp.*, 150 Ariz. 526, 724 P.2d 612 (Ariz.App.1986); *Schaffner v. Chicago & North Western Transp. Co.*, 161 Ill.App.3d 742, 113 Ill.Dec. 489, 515 N.E.2d 298 (1987); *Salvi v. Montgomery Ward & Co., Inc.*, 140 Ill.App.3d 896, 95 Ill.Dec. 173, 489 N.E.2d 394 (1986); *Leischner v. Deere & Co.*, 127 Ill.App.3d 175, 82 Ill.Dec. 120, 468 N.E.2d 182 (1984); *Foster v. Marshall*, 341 So.2d 1354 (La.App. 1977); *Stanley v. Schiavi Mobile Homes, Inc.*, 462 A.2d 1144 (Me.1983); *Payson v. Bombardier, Ltd.*, 435 A.2d 411 (Me.1981); *Belfry v. Anthony Pools, Inc.*, 80 Mich. App. 118, 262 N.W.2d 909 (1977); *Herman v. Midland AG Serv., Inc.*, 200 Neb. 356, 264 N.W.2d 161 (1978); *Reiger v. Toby Enterprises*, 45 Or.App. 679, 609 P.2d 402 (1980); *Stark v. Allis–Chalmers and Northwest Roads, Inc.*, 2 Wash.App. 399, 467 P.2d 854 (1970); and *Caldwell v. Yamaha Motor Co., Ltd.*, 648 P.2d 519 (Wyo. 1982).)

The issue of notice was squarely before a jury capable of weighing opposing evidence. We find no abuse of discretion in admitting evidence of the relevant trouble tickets in this case. Appellant's point is denied.

### B.

■ Additionally, appellant contends the trial court erred in admitting testimony of Dwayne Frakes. Frakes testified he applied fertilizer to the same field five years earlier and struck the same guy wire that Pierce ultimately hit. Pierce argues that this testimony was properly admitted as proof of the dangerous nature of the unmarked guy wire. Appellant argues again that the conditions were not sufficiently similar and Frakes' testimony confused the issues before the jury.

Mr. Frakes' testimony presents a unique factual situation in that he was one of the first witnesses arriving at the scene after Pierce's accident and was, thereby, in a unique position to compare the conditions at the time of Pierce's accident to the conditions five years earlier. Mr. Frakes explained that he was in the field at the same time of year, the brush at the edge of the field was "basically the same," the cultivation pattern was the same, and that like Pierce, he never saw the guy wire before he struck it with his tractor. No report of the Frakes' incident was made to the cooperative because there was no apparent damage to the wire or the pole.

Appellant's objection at trial claimed the Frakes' testimony was irrelevant to the issue of appellant's notice of the unmarked guy wire because the incident went unreported. However, appellant clearly failed to grasp that this evidence was received for a purpose separate from the issue of notice. Rather, the evidence demonstrated that farmers could not see the guy wire, and that left unmarked it created a dangerous condition. Evidence admissible for one purpose may be admitted even though it may be improper for other purposes. *Ransom v. Adams Dairy Co.*, 684 S.W.2d 915, 918 (Mo.App.1985). When received for the purpose of demonstrating a dangerous condition, the fact that the cooperative was never notified of the Frakes' incident is in itself irrelevant. Appellant's objection to the testimony missed the mark.

In *Doyle v. St. Louis–S.F. Ry. Co.*, 571 S.W.2d 717 (Mo.App.1978), the court allowed a witness to testify of his experience at a railroad crossing one year after the collision at issue. The witness explained that because of overgrown vegetation he had been unable to see an approaching train and stopped his car three feet short of the tracks only when he felt the vibrations caused by a moving train. The court was satisfied that the vegetation conditions a year after the accident at issue were sufficiently similar. While the witness was in no way harmed and did not claim to have notified the railroad of the danger, the testimony was found relevant to demonstrate the dangerous nature of a crossing overgrown with vegetation. *Id.* at 726.

Likewise, Pierce contends Mr. Frakes' testimony was relevant to show the dangerous nature of a guy wire left unmarked. Missouri courts long have recognized that evidence of prior similar occurrences is admissible as proof of a dangerous condition. *See, e.g., Cameron v. Small*, 182 S.W.2d 565, 570 (Mo.1944); *Benner v. Terminal R.R. Ass'n of St. Louis*, 348 Mo. 928, 156 S.W.2d 657, 663 (1941). While there is no way that conditions will be exactly the same as at the instant of the accident, it is sufficient for admissibility that the conditions be substantially similar. *Salsberry v. Archibald Plbg. & Heat Co., Inc.*, 587 S.W.2d 907, 912 (Mo.App.1979).

We recognize that the determination of what is evidence of a similar occurrence is often subjective. For that reason, as we have said, a trial court has substantial discretion in ruling on the admissibility of evidence. *Karashin v. Haggard Hauling & Rigging, Inc.*, 653 S.W.2d 203, 205 (Mo. banc 1983). Thus, the admission or exclusion of questionable evidence is committed to the sound discretion of the trial court and will not be disturbed on appeal absent a clear abuse of discretion. *Lawson v. Schumacher & Blum Chevrolet, Inc.*, 687 S.W.2d 947, 951 (Mo.App.1985).

It was within the trial court's discretion to determine whether Mr. Frakes' testimony described a sufficiently similar event to warrant its inclusion into evidence as proof of the dangerous quality of this particular unmarked guy wire. *See Walton v. United States Steel Corporation*, 362 S.W.2d 617, 626 (Mo.1962).

We are convinced that Mr. Frakes' testimony was relevant to the issue of a dangerous condition. We find no abuse of discretion in the trial court's determination that Pierce laid a sufficient foundation of similarity between the events to tip the scales of relevancy in favor of admissibility. Appellant's point is denied.

## C.

Appellant labels Pierce's accident as "bizarre", "improbable" and "incredulous." Appellant's contention confuses foreseeable harm resulting in a duty of care with the ultimate consequence stemming from a finding of proximate cause.

∎ We agree that the actual chain of events in this case is remarkable. However, a duty exists when a general type of event or harm is foreseeable. Appellant seems to argue that foreseeability is measured by the probability of whether Pierce's specific, actual injury can be anticipated. We disagree. In determining foreseeability for the purpose of defining duty, it is immaterial that the *precise* manner in which the injury occurred was neither foreseen nor foreseeable. *Gold v. Heath*, 392 S.W.2d 298 (Mo.1965); *Tharp v. Monsees*, 327 S.W.2d 889, 894 (Mo. banc 1959). W. Prosser & W. Keeton, *Prosser and Keeton on the Law of Torts*, § 43 p. 299 (5th ed. 1984).

∎ This Court has suggested that foreseeability is established when a defendant is shown to have knowledge, actual or constructive, that there is some probability of injury sufficiently serious that an ordinary person would take precautions to avoid it. This does not require the balancing of probabilities as appellant suggests. *Price v. Seidler*, 408 S.W.2d 815, 822 (Mo.1966).

Pierce was injured when he set into motion a chain of events emanating from his farm machinery running into an unmarked guy wire. Because of the nature of the accident, Pierce was required to offer proof of the foreseeability of two aspects of this event: (1) the likelihood that an operator of farm machinery would fail to see the guy wire and run into it with his machinery, and (2) the likelihood that farm machinery running into the guy wire would result in the support pole breaking allowing the cable to drop across the highway.

The record provides ample evidence from which a jury could conclude it was reasonable to foresee that farm machinery would be operated in the vicinity of the wire and that the operator would not see the guy wire. The jury was provided photo exhibits demonstrating the location of the wire and the difficulty in seeing the wire. The jury heard testimony that brush surrounded the pole and guy wire making it difficult to see. Finally, witness Frakes' testimony concerning his previous experience of striking the same guy wire was admitted by the trial court as evidence that this guy wire was susceptible to being inadvertently struck by farm machinery operators.

As to the second aspect, Pierce offered the trouble tickets to demonstrate that not only was farm machinery striking guy wires but that support poles were breaking. The jury could find that these reported events demonstrated notice to appellant that its poles were breaking as a result of machinery striking the supporting guy wire and the potential hazard which occurred here—the cable falling—was thereby created.

The jury was capable of weighing the evidence and determining that appellant could have foreseen the likelihood that farm machinery would be operated in the vicinity of the unmarked guy wire, that the operator of the machinery would fail to see the wire and run into it, and that the result would be to break the supportive pole allowing the attached cable to drop across the highway. The jury could determine that a dropped cable across a busy highway constituted a hazard. It was this finding that affirmed appellant's duty to exercise ordinary care to address the foreseeable hazard of its unmarked guy wire.

## IV.

### Jury Instructions

#### A.

∎ Appellant makes two challenges to Pierce's verdict-directing instruction. The instruction read:

In your verdict you must assess a percentage of fault to Defendant if you believe:

First, Defendant maintained a guy wire near the northeast corner of a cultivated field on the Kurtenbach farm property in support of a utility pole with attached cable crossing over "HH" Highway, and

Second, such guy wire was not equipped with a guard or marker and as a result persons operating farm machinery on the Kurtenbach farm property were exposed to an unreasonable risk of running the machinery into the guy wire and being injured, and

Third, Defendant knew or by the exercise of ordinary care should have known of the existence of this condition and such unreasonable risk, and

Fourth, Defendant failed to use ordinary care to remedy it, and

Fifth, such failure directly caused or directly contributed to cause injury to Plaintiff.

This instruction is a modified version of MAI 22.03.[3]

Appellant first challenges the use of the term "remedy" in the fourth paragraph as an impermissible deviation from MAI 22.03. Appellant argues that that instruction as given allows the jury to assess fault for a variety of perceived failures. Appellant contends the use of the phrase "to warn of it" would have been more appropriate to the issues of the case and consistent with the suggestions provided in the MAI.

The factual situation and instructional challenge in *Jackson v. City of St. Louis*, 422 S.W.2d 45 (Mo.1967), is closely analogous to the case at bar. In *Jackson*, the plaintiff sued the City of St. Louis for injuries sustained when he ran into an un-

marked steel post anchored near a public baseball field. On appeal, the city challenged the plaintiff's verdict-directing instruction. This Court rejected the city's argument and found that precise language used to define a defendant's duty or breach is not critical so long as the jury is required to find that the condition complained of presented a foreseeable risk of injury, that the defendant had actual or constructive knowledge of the risk and that defendant failed to remedy it. *Id.* at 48–49. The verdict-director in *Jackson* is nearly identical to the instruction submitted in the present case. We approved the use of the term "remedy" in *Jackson*.

While we will not brook unnecessary deviations from the MAI provided, we find no reversible error in the use of the word "remedy" in this case. The instructions preceding the MAI's suggest that when "an approved instruction does not precisely fit your case but one or more instructions are close to it, modifications must be made. Occasionally, the modification will be made by incorporating part of another MAI." MAI 3rd "How to use this Book," p. XCIV [1981]. Use of the term "remedy" is suggested in MAI 22.04 and 22.08, both quite similar to the 22.03 verdict-director submitted in this case. Clearly, there is no specific instruction provided for unmarked guy wire cases. The use of similar pattern instructions was necessary to make the submitted instruction both accurate to this unique case and understandable to the jury.

Moreover, we find no merit in appellant's claim that the use of the term "remedy" was so broad as to create a roving commission. Appellant's argument assumes the term remedy was so vague the jury as-

3. MAI 22.03 states:
Verdict Directing—Invitee Injured
Your verdict must be for plaintiff if you believe:
First, there was (here describe substance on floor which caused the fall) on the floor of defendant's store and as a result the floor was not reasonably safe for customers, and
Second, plaintiff did not know and by using ordinary care could not have known of this condition, and

Third, defendant knew or by using ordinary care could have known of this condition, and
Fourth, defendant failed to use ordinary care to [remove it] [barricade it] [warn of it], and
Fifth, as a direct result of such failure, plaintiff was injured.
MAI 22.03 is the pattern instruction for a business invitee slip and fall case. Modifications necessarily had to be made to fit this instruction into the fact pattern of this case.

sessed fault for a number of perceived wrongs including a failure to cut down brush surrounding the guy wire or a failure to move the guy wire. The claimed erroneous portion of the instruction cannot be read apart from the preceding three paragraphs of the verdict-director. Specifically, in paragraph 2nd, the jury was instructed that it was strictly the absence of the guard or marker that resulted in the unreasonable risk. The next paragraph suggested the appellant should have known of the condition of the unmarked guy wire. Finally, in paragraph four, the jury was to examine whether appellant failed to remedy this same condition, i.e., the absence of the guy marker.

The jury clearly based their verdict on appellant's failure to mark a guy wire situated close to a cultivated field. As noted in *Jackson*, "[a]lthough often done, it is not necessary to say the same thing twice," 422 S.W.2d at 49. Likewise, it was not necessary for Pierce's verdict-director to use the phrase "warn of it" when the jury already found that it was the absence of a guard or marker that resulted in the condition of unreasonable risk. Use of the term "remedy" was appropriate under the facts and theory of the case and certainly was not prejudicial when the instruction is read in context and in its entirety.

### B.

Next, appellant charges that the trial court erred in submitting Pierce's verdict-directing instruction because the use of the term "persons" in paragraph second was confusing or misleading to the jury. Appellant argues that the use of the plural imposed an additional burden to show its lack of negligence in the 1980 Frakes incident as well as the subject incident.

Appellant's argument is exaggerated to suggest the jury believed the Frakes incident was also on trial. As previously discussed, the Frakes testimony was relevant for the limited purpose of demonstrating the danger of leaving the guy wire at issue unmarked. We do not infer that the jury was incapable of discerning relevant evidence from the proper meaning of the MAI

instruction. In contrast, it is assumed the jury is composed of reasonably intelligent men and women who read the instruction and understood it. *Deskin v. Brewer,* 590 S.W.2d 392, 401 (Mo.App.1979); *Price v. Seidler,* 408 S.W.2d 815, 823–24 (Mo.1966).

Likewise, appellant's duty was properly defined as owing to all persons operating farm machinery in the vicinity of the unmarked guy wire. In the 22.00 series of instructions defining the duties of owners or occupiers of land (appellant was an occupier), instructions 22.01, 22.02, 22.03 and 22.04 use plural terms such as "children," "persons," "customers," and "the public." None of the owner/occupier approved instructions define duty in terms of an individual plaintiff.

The instruction was consistent with the plural form used in the MAI. Appellant's duty was properly defined by the instruction given. Appellant fails to demonstrate the prejudice created by use of a plural term approved in the MAI. Appellant's second challenge to the verdict-directing instruction is without merit.

### V.

### Improper Comments

#### A.

■ Appellant's last assignments of error concern the trial court's refusal to grant a mistrial upon alleged improper comments made by Pierce's counsel during opening statement and closing argument. We first consider the comments made during closing argument.

Toward the end of his closing, Pierce's counsel remarked "when you're done you can send a message to the utility world." This statement properly drew an immediate objection. The trial court sustained the objection and instructed the jury to disregard the remark; however, the court refused to sustain appellant's motion for a mistrial.

■ The decision to grant a mistrial lies in the sound discretion of the trial court. Absent a manifest abuse of discretion, an appellate court will not interfere with the trial court's decision. *Hoene v.*

*Associated Dry Goods Corporation,* 487 S.W.2d 479, 486 (Mo.1972); *Smith v. Courter,* 531 S.W.2d 743, 746 (Mo. banc 1976). However, Missouri courts have long shown displeasure with "send a message" arguments in cases where punitive damage are not sought. *Accord, Smith,* 531 S.W.2d at 747; *Fisher v. McIlroy,* 739 S.W.2d 577, 581 (Mo.App.1987). When the message argument becomes the theme of the entire closing, it constitutes reversible error. *See Smith* 531 S.W.2d at 748; *Fisher,* 739 S.W.2d at 582.

Wisdom gathered from long experience tells us that trial courts are better positioned to assess the amount of prejudice injected by admittedly improper arguments. *Graves v. May Department Store Co.,* 153 S.W.2d 778, 785 (Mo.App.1941). Given the cold record on appeal, appellate courts of this state uniformly uphold trial courts' determinations of the prejudice injected by "send a message" arguments. *See, e.g., Smith,* 531 S.W.2d at 747 (trial court affirmed in granting new trial); *Graves,* 153 S.W.2d at 785 (trial court upheld in refusing mistrial); *Dickerson v. St. Louis Southwestern Ry. Co.,* 674 S.W.2d 165, 173 (Mo.App.1984) (trial court upheld in refusing mistrial); *Fisher,* 739 S.W.2d at 582 (trial court's order granting new trial affirmed).

Here, Pierce's counsel danced dangerously close to reversible error. However, the quick objection by appellant's able counsel and the trial court's firm instruction to the jury prevented prejudice. The trial court's refusal to grant a mistrial was not an abuse of discretion.[4] *Hoene,* 487 S.W.2d at 484. Appellant's point is denied.

### B.

■ Appellant's final assignment of error concerns a comment by Pierce's counsel in opening statement and a question posed to a witness concerning appellant's policy of marking guy wires. In opening statement, Pierce's counsel suggested "[T]his company never made a policy of putting guy markers on their wires." Appellant's objection was sustained. In direct examination, Pierce's counsel asked a witness about any changes in the cooperative's procedure as a result of the trouble tickets concerning farm machinery striking unmarked guy wires. The trial court sustained appellant's objection but overruled the motion for mistrial. Appellant charges that the cumulative effect of these comments suggested to the jury that appellant deserved to be punished.

Again, we defer to the trial court's discretion in gauging the prejudicial effect of attorney's comments. *Hoene,* 487 S.W.2d at 486. However, we are not convinced that Pierce's attempt to introduce evidence of appellant's inspection policy was a veiled attempt to claim punitive damages. In a bench conference prior to the second day of trial, Pierce's counsel explained he was attempting to offer evidence to show the cooperative's knowledge of the unmarked guy wires as well as their failure to exercise ordinary care in inspecting and marking the wires. The fact that Pierce did not seek punitive damages did not relieve him of the burden of proving appellant's failure to meet its duty to prevent a foreseeable harm.

As proof of appellant's failure of care, Pierce was able to introduce evidence showing appellant's policy of inspecting their lines with superseded check forms. This evidence of appellant's policy went to the very heart of Pierce's case. The fact that this evidence made out a convincing case of negligence does not mean it was only admissible in a punitive damage case.

We find these comments went to the issue of the cooperative's notice of the danger and a policy which prevented it from exercising ordinary care. The comments were not in error and therefore there can be no prejudice.

---

4. Appellant also complains that Pierce's counsel remarked, "When farmers here in Buchanan County are injured, they will be fully compensated." The argument drew an objection but was overruled. The trial court determined that the argument was not objectionable, and this Court cannot say that the trial court abused its discretion in making that determination. *Dickerson v. St. Louis Southwestern Ry. Co.,* 674 S.W.2d 165, 173 (Mo.App.1984).

■

## VI.

The judgment of the trial court is affirmed.

BILLINGS, C.J., and BLACKMAR, WELLIVER, RENDLEN, HIGGINS, JJ., and GAERTNER, Special Judge, concur.

COVINGTON, J., not sitting.