Maxine **WASHBURN** and Joe Washburn, **Respondents,**

v.

**GRUNDY ELECTRIC COOPERATIVE, Appellants.**

No. WD 42767.

Missouri Court of Appeals, Western District.

Feb. 26, 1991.

David P. Madden, Overland Park, Kan., and Allan Seidel, Trenton, for appellants.

Jerold L. Drake, Grant City and George L. Gundy, Memphis, for respondents.

Before MANFORD, P.J., and BERREY and GAITAN, JJ.

GAITAN, Judge.

The plaintiffs-respondents, Maxine and Joe Washburn, sued the defendant-appellant, Grundy Electric Cooperative, Inc., for wrongful death and personal injury. The jury awarded Maxine Washburn $500,000 and Joe Washburn $25,000, and assessed 70 percent of fault to appellant and 30 percent to Joe Washburn and the deceased, William Washburn. The defendant-appellant appeals alleging the trial court erred by (1) permitting expert testimony where there was insufficient foundation qualifying respondents' experts; (2) failing to sustain appellant's motion for a directed verdict or for a new trial; (3) mishandling the jury instructions as well as the jury; and (4) permitting damages to be awarded to Joe Washburn. We affirm.

William and Maxine Washburn moved to a farm in rural Harrison County in December, 1962. Prior to that time they did not own the farmland but leased it.

Two grain bins were bought in the 1970's and placed on the land. One, the west bin, was purchased by the owner of the farm in the early 70's and the other, the east bin, was purchased by William and Maxine Washburn in the late 70's.

Prior to December 3, 1978, a transformer which stepped down the 7,200 volts of electricity to 120 over 240 volts was located on the township right-of-way west of the farm. On that date, the transformer was moved by the appellant 235 feet east to a location between the two bins. This increased the voltage in the wire over the driveway to 7,200 volts.

On January 13, 1987, the upright auger on the west grain bin had a bearing out. At approximately 5:30 to 6:00 p.m., William Washburn and his son, Joe Washburn, decided to use the horizontal auger on the bin to move the beans out of the bin and use the power take-off auger to load the beans. While the grain auger was being moved into position, it came in contact with the transmission wire and electricity escaped killing William Washburn and injuring Joe Washburn.

*Joe* Washburn did not remember the accident but he did not think the grain auger came in contact with the wire. Maxine Washburn was milking on the evening of January 13, 1987, when her husband told her he was going down to move the auger. She later found her husband and son lying on the ground. She testified about the activity at the farm until her husband was taken away by ambulance.

Robert Washburn, son of Maxine and William Washburn, testified that he lived with his parents on January 13, 1987, and that he came home that night after the ambulance had gone. He took his brother, Joe, to the hospital. He testified as to the close relationship between his father and mother as did his sister, Jayla Smith.

The jury awarded Maxine Washburn $500,000 and Joe Washburn $25,000. The jury assessed 70 percent of the fault to appellant and 30 percent to Joe Washburn and William Washburn.

## I.

It is well settled law in Missouri that whether to admit or exclude the testimony of an expert is a decision left to the discretion of the trial judge. *Ballwin v. Hardcastle*, 765 S.W.2d 324, 326 (Mo.App. 1989). There is no requirement that an expert witness have expertise based solely upon his education. An individual with substantial practical and specialized experience in a given area may also qualify as an expert in a given field. *Mathis v. Glover*, 714 S.W.2d 222, 229 (Mo.App.1986); *Skelton v. General Candy Co.*, 539 S.W.2d 605, 614 (Mo.App.1976). The final determination of whether the person qualifies as an expert is left to the discretion of the trial court. 714 S.W.2d at 229; 539 S.W.2d at 614.

The transcript is replete with evidence showing that both of respondents' experts, William Charles Heilman and Eugene Fisher, were qualified as experts in their respective fields and that their testimony was competent.

Heilman testified that he was a safety engineer and safety consultant, and was a holder of a Bachelor of Science Degree, major in social science, from the University

of Wisconsin. He further testified that he has a Certified Safety Professional designation and is a registered professional safety engineer in the State of California.

Heilman also stated that he is a member of the American Society of Safety Engineers as well as two sub-groups of that organization, one being a consultant's group, the other an engineer's group. He further testified that he is a member of the Systems Safety Society, the Human Factors Society, the International Association of Electrical Inspectors, the National Safety Council and other related groups. Heilman also testified that he subscribes to various trade journals and publications.

Heilman testified that his work experience included seventeen years experience as a safety consultant. He further stated that he had his own consulting firm and, over the years, had consulted on safety matters for the United States Department of Labor, the Occupational Safety and Health Administration, and various state governments in conjunction with their safety compliance programs. He further testified that he had consulted with private industry throughout the United States in the area of accident investigation and prevention.

As additional work experience, Heilman testified that he has been employed by utilities throughout the United States as a consultant whereby he would examine hazards surrounding electrical distribution and transportation equipment. He also testified that he worked for Employers Insurance of Wausau for five years during which time he worked with rural electric cooperatives to help them identify hazards surrounding transmission and distribution lines and other equipment. Heilman went on to state that he also had prior work experience as a mechanical and electrical draftsman, had designed an electrical system, and had experience going into the field with electrical crews to examine their work and methods from the standpoint of minimizing hazards to themselves and the general public. He further testified that 30 percent of his experience related to electrical hazards and their prevention and that

he had qualified to testify in courts of law as a safety engineer many times. Finally, Heilman has received 49 additional college credits since graduating from college, which were awarded on the basis of experience, with 40 of those credits in the field of safety.

Heilman is a safety consultant and safety engineer. Despite appellant's contentions to the contrary, he never claimed to be an electrical engineer. This is a different discipline with different words of art. His status as an expert is based upon both his post-college education and experience. His testimony on those two points was more than sufficient for the trial court to have allowed him to testify as a safety expert.

Appellant argues that Heilman had insufficient data to reach his conclusions as to the cause of the accident in question. Heilman testified about his observations and opinion as to the cause of the accident as well as to possible violations of any standards, practices, customs or accords by appellant; compliance with which would have prevented the accident from occurring. In conjunction with that, he testified that he had been to the Washburn farm prior to trial. He also testified that he had used aerial photographs of the farm, and various other exhibits which were admitted into evidence, to reach his opinion. He further stated that he made measurements while at the farm which he used in his analysis. He also stated that he used the National Electric Safety Code as adopted by the American Standards Institute in helping him reach his conclusions.

It is also clear that Eugene Fisher is qualified as an expert in the field of mechanical engineering. He testified that he graduated from the University of Cincinnati College of Engineering in 1952 with a M.E. Degree in Engineering. Fisher is a professional engineer, licensed as such in the states of Ohio, Illinois, Missouri, Kansas, and Iowa. He is also a member of the American Society of Mechanical Engineers and the Agriculture Society of Engineers.

Fisher testified that following graduation he worked with various firms as a mechani-

cal engineer until 1974 when he began his own engineering firm. At trial, he testified that he had worked on high voltage wiring in plants and at construction sites. He has also analyzed electrical and mechanical systems in various plants. He further testified as to the classes he has taken in the fields of electricity and electrical theory as well as to various seminars on those subjects he has attended.

Fisher testified that he had been present at the Washburn farm prior to trial. He made certain measurements while at the farm which he used in his analysis, inspecting and measuring the farm's electrical system as well. He also testified that he made and used a scale drawing of the farm and reviewed the interrogatory answers in reaching his conclusions. He relied, in part, on the pertinent parts of the National Safety Code.

The facts in the case before the Court differ significantly from those in the case cited by appellant. *Hoban v. Grumman Corp.*, 717 F.Supp. 1129, 1133–34 (E.D.Va. 1989), *aff'd*, 907 F.2d 1138 (4th Cir.1990), *reh'g denied, Hoban v. Grumman Corp.*, 907 F.2d 1138 (4th Cir.1990). The trial court in that case held that the expert's testimony was not admissible for several reasons. First, the court noted that the case involved the alleged failure of a plane's jet engine and fuel system, the particular engine being destroyed when the plane crashed. The court noted that not only was the expert unable to study the failed engine since it had been completely destroyed, but also failed to view the engine or fuel system of any similar aircraft. Further, the expert failed to view important components of the crashed plane which were available.

The court went on to note that at no time did the expert testify that he was familiar with either the engine of the plane or its fuel system, both of which he was claiming were defective.

The cases of *Rose v. Fague–Prouhet*, 701 S.W.2d 509 (Mo.App.1985), and *Russell v. Mid–Western Homes & Truss, Inc.*, 514 S.W.2d 651 (Mo.App.1974), are cited by appellant for the proposition that respon-

dents' experts did not have practical and specialized experience in the field of electrical engineering. However, appellant's reliance on those cases is misplaced. In *Russell,* the Court held that a person with specialized experience with chicken houses, with no education in that area, was qualified by experience to testify as to the cause of the collapse of a chicken house. *Id. Rose* merely held that an expert could not testify as to point of impact in an automobile collision. *Rose*, 701 S.W.2d at 511. The Court in *Rose* also stated that the admission or exclusion of testimony from an alleged expert is in the trial court's discretion, and that that decision will not be disturbed absent an abuse of that discretion. *Id.* at 512.

In *Criger v. Webster Elec. Coop.*, 783 S.W.2d 941 (Mo.App.1990), plaintiffs' expert was an electrical engineer who gave his opinion relative to stress failure of ceramics. He was not an expert in ceramics or in stress failure analysis. The Court stated as follows:

> The determination of the qualifications of an expert witness and the admissibility of opinion evidence is within the discretion of the trial court, not to be interfered with on appeal unless it plainly appears that there has been an abuse of that discretion. *Cheek v. Weiss*, 615 S.W.2d 453, 456 (Mo.App.1981). *See also, Eichelberger v. Barnes Hospital*, 655 S.W.2d 699, 704 (Mo.App.1983).

*Criger*, 783 S.W.2d at 942; *see also Hord v. Morgan*, 769 S.W.2d 443, 448 (Mo.App. 1989). We hold the appellant's argument on this point to be without merit.

## II.

■ Defendant-appellant argues that its motion for a directed verdict, or in the alternative, a new trial, should have been granted by the trial court. This argument is also without merit. There was ample evidence presented at trial from which the jury could have found the appellant negligent. Appellant argues that Joe Washburn testified that he caused the accident. However, Washburn testified that he could remember nothing from the time he left

the house with his father on the way to the grain bins until he woke up next to his father lying on the ground. He has no recollection of the accident or how it happened. His testimony that he "caused the accident" was merely his statement that he and his father were engaged in an activity near the power line when the accident occurred. Further, it is inconsistent with his claim that the auger never came into contact with the power line.

There was testimony by William Heilman, one of respondents' experts, that the 7,200 volt line was not sufficiently insulated for the foreseeable conditions under which it would be operated, that is, near an area involving the regular use of 35 foot tall farm machinery.

There was testimony from Joe Washburn that shortly after the accident he witnessed appellant's employees come to the farm to raise the power line to allow a grain dryer to pass under it. The individual who moved the grain dryer also testified that the line had to be raised two or three feet for the grain dryer to pass under it. Also, Heilman testified that he had measured the grain dryer in question and found it to be 16 feet, 8 inches tall, meaning that the line in question was approximately 18 feet above the ground.

Heilman further testified that appellant could have supplied electricity to the farm so that the accident would not have happened. The transformer could have been left where it was rather than moving it directly over the grain bins. He further testified that the line could have been buried, it could have been insulated or it could have been put in a place where tall farm machinery was not in regular use. Finally, Heilman testified about the several ways that appellant had failed to comply with the 1977 Electrical Safety Code which was then in effect.

Eugene Fisher, respondent's second expert, also testified concerning the negligence of appellant placing a 7,200 volt power line where tall farm machinery was regularly used and how appellant had failed to comply with the Electrical Safety Code. Fisher further testified that he had been to the farm at night (the accident having occurred in the evening) and had been unable to see the power line in the dark.

There was further evidence of negligence provided by appellant's own witnesses. Robert Burkeybile, an employee of appellants, stated that a 7,200 volt line with inadequate clearance would be a hazard. Eldon Woodard, another employee, stated that if the line had to be raised two or three feet to allow the grain dryer to pass under it, the line would not have been in a safe condition. Woodward further testified that if a person were at the farm at night, he would be unable to see the power line without the aid of a spotlight.

■ Mere compliance with an industry's standards is not necessarily enough to prevent a jury from finding that defendant has breached a duty of care. *Pierce v. Platte-Clay Elec. Coop.*, 769 S.W.2d 769, 772 (Mo. banc 1989). That would, in effect, permit an industry to establish its own standards for negligence. The defendant in *Pierce* attempted to equate compliance with the National Electric Safety Code with the exercise of ordinary care as appellant has attempted to do in the present case. *Id.* That argument was rejected by the court.

Even though the *Pierce* case involved reasonable care rather than the highest degree of care, the Court found that the jury could find the defendant should have foreseen the likelihood that farm machinery would be operated in an area near an unmarked guy wire, that the machinery driver would not see it, that he would run into it with the machinery, that this would cause the pole to break, thereby leaving the cable lying across a highway, thereby constituting a hazard. *Id.* at 776.

In the case of *Potter v. Sac-Osage Elec. Coop.*, 335 S.W.2d 192, 197 (Mo.1960), the Court stated that the plaintiff could reasonably have assumed that the agents of the defendant power company would build a power line which would not pose a danger to human life. The Court further found that the power company knew that the line they were building would be over a grain bin where men unacquainted with electricity and its dangers would be required to

work in close and dangerous proximity to the power line. The court affirmed the jury's determination that defendant electric company was liable for negligence.

In *Clary v. United Tel. Co.*, 670 S.W.2d 936, 940 (Mo.App.1984), the Court stated that just because a person has knowledge of the danger of a power line and knows that one is there does not mean that he is contributorily negligent as a matter of law, if he contacts it.

In *Mrad v. Missouri Edison Co.*, 649 S.W.2d 936, 940 (Mo.App.1983), the Court held that a generator and transmitter of electricity, although not an insurer, is still obligated to exercise the highest degree of care to prevent a foreseeable injury and can still be liable even if it does not anticipate the exact injury or the manner in which it came about.

The issue is whether the defendant, using the highest degree of care, could have foreseen that an injury was likely to occur to one lawfully near the transmission line. The Court went on to note that while power companies are not subject to strict liability where the question of foreseeability is involved, the courts have usually found that that is a question for the jury.

Given the evidence and cases cited, there was ample evidence from which the jury could have found appellant negligent.

### III.

■ Appellants argue that the trial court erred in submitting a verdict director that stated "submitted by Defendant" at the bottom of the page. It should be noted, however, that appellants provided the court with the "dirty" copy of Instruction Number 10. The appellant never submitted, even though requested to do so, a clean copy of that instruction to the court to present to the jury. In *Lazane v. Bean*, 782 S.W.2d 804, 807 (Mo.App.1990), this Court held that a party cannot complain of an error in instructions which that party requested. In *Hodges v. Hodges*, 692 S.W.2d 361, 375 (Mo.App.1985), the Court held that on appeal, a party may not complain of invited error. The Court went on to state that in the case of jury instructions

that rule would be applied if it appeared that the court was led or induced to commit the error.

Any error committed was harmless in that there was no prejudice to appellant. Instruction Number 10 asked the jury to find Joe and Bill Washburn at fault in causing the accident. The jury, in fact, assessed 30 percent of the fault against them. Further, the trial judge at the time of the hearing of appellant's motion for new trial, had the jurors brought in and asked them if they had noticed the marking on the instruction or if it had been discussed in the jury room, to which all twelve replied in the negative.

In *Fowler v. Park Corp.*, 673 S.W.2d 749, 755 (Mo. banc 1984), the Court stated that discipline is necessary to keep counsel honest in the presentation of instructions. The Court further stated that only defects of substance in the instructions should warrant reversal. *Id.* at 756. The Court noted the burden of retrials and stated that there had been a trend away from reversal for erroneous instructions unless there was substantial prejudice. *Id.* at 757.

In *Hudson v. Carr*, 668 S.W.2d 68, 71–72 (Mo. banc 1984), the Court noted that while objections to instructions are not required, the failure of appellant to object to an instruction during trial can be used in determining if a variation from MAI is prejudicial. The Court also stated that if the error is so unobvious that counsel fails to catch it, there is very little chance that the jury would be misled by it. The Court also held that counsel "should think twice before simply putting perceived deviations from M.A.I. or the Notes On Use into the error bag...." *Id.*

■ On the subject of recalling the members of the jury panel, appellant is correct that a jury may not impeach its own verdict. However, the trial judge made clear from the outset of the hearing on appellant's motion for new trial that the jury was not being recalled in order to impeach their verdict, but rather, to defend it.

■ The law in Missouri is well settled that a jury can testify or give affidavits in defense of their verdict. *Chrum v. St. Louis Pub. Serv. Co.*, 242 S.W.2d 54, 56 (Mo.1951); *Jordan v. St. Joseph Ry. Light, Heat & Power*, 335 Mo. 319, 73 S.W.2d 205, 210 (1934). Upon testifying, each and every juror stated that none of them had noticed the marking "submitted by Defendant" upon Instruction Number 10 and that the fact that it was marked differently was not discussed.

Therefore, because the jurors' testimony served to uphold the verdict rather than impeach it, the trial judge's actions in recalling the jury to testify at the hearing on defendant's motion for new trial to defend the verdict were proper.

### IV.

■ The award of $25,000 to Joe Washburn for his injuries is supported by the evidence. Washburn testified that he had incurred doctor and hospital bills for treatment of the injuries he suffered. Further, he testified that both his hands were injured and that he has large and small scars on them which hurt during cold weather. He further testified that it was difficult for him to use rough handled tools, such as a ratchet.

Joe Washburn's brother, Rob Washburn, took Joe to the hospital following the accident. Rob testified that Joe's hands were both raw and blistered after the accident and that he was in obvious pain. Joe Washburn also testified that he had suffered a permanent memory loss as a result of the accident.

A part of Joe Washburn's damages may be attributed to emotional distress. Throughout the transcript of the trial, Joe was urged to speak louder even though the emotional turmoil he suffered by reliving his father's death made that decidedly difficult for him. The emotional distress was also evident when defense counsel repeatedly attempted to have Joe Washburn state that he had, in fact, killed his father through his own negligence. The emotional distress was increased by the memory loss which will forever prevent him from knowing exactly what happened when he and his father left the house to go to the grain auger. Finally, he testified about waking up from unconsciousness beside his father and his futile attempts to revive him.

The jury was in a better position to evaluate Joe Washburn's losses than he was himself. In *Gardner v. Reynolds*, 775 S.W.2d 173, 175 (Mo.App.1989), this Court stated that it is the jury's function to assess the amount of damages. This court further stated that determination of damages should not be disturbed in the absence of an award so grossly excessive as to shock the Court's conscience. The ultimate test is what will fairly and justly compensate the plaintiff.

■ Mere excessiveness of verdict does not show that it was the result of bias or prejudice on the part of the jury. *Mullen v. Dayringer*, 705 S.W.2d 531, 536 (Mo. App.1985). The appellant must also show that the verdict is glaringly unwarranted and that it was the result of some trial error or misconduct by the respondents which caused the jury to be prejudiced. Appellant has failed to meet this burden.

In *Kenton v. Hyatt Hotels Corp.*, 693 S.W.2d 83, 97 (Mo. banc 1985), the Supreme Court stated that a jury is entitled to consider certain intangibles in reaching a determination as to damages including evidence of past and future pain, suffering, effect on previous lifestyle and evidence of economic loss. Further, the Court held that a jury is in far better position to assess damages than is an appellate court.

For the aforesaid reasons the judgment of the trial court is affirmed.

BERREY, J., concurs.

MANFORD, J., did not participate in the decision of this case due to his death on February 12, 1991.